# COURT OF APPEALS,
## April 18, 1916.

## THE PEOPLE v. ANTONIO MANGANARO.

### (218 N. Y. 9.)

(1.) MURDER—DEFENSE OF INSANITY—ERRONEOUS ADMISSION OF EVIDENCE OFFERED BY PROSECUTION IN REBUTTAL—WHEN JUDGMENT OF CONVICTION MUST BE REVERSED BECAUSE TRIAL WAS RENDERED UNFAIR BY IMPROPER AND INTEMPERATE ARGUMENTS AND STATEMENTS OF COUNSEL FOR THE PROSECUTION IN SUMMATION TO THE JURY.

The defendant was indicted and tried for the killing of his wife and the jury found a verdict of murder in the first degree. The defense was insanity in the form of melancholia with frenzy, and substantial evidence in behalf of the defendant in support of it was received. In rebuttal of evidence as to defendant's mental condition a writing was received under objection and exception as bearing on the question of the sanity of the defendant at that time. The paper, which was in the Italian language, was also treated by the prosecution in summing up as evidence of premeditation on the part of defendant. No evidence was presented that the name at the end of the writing or any part of the writing was written by the defendant or by another at his direction or suggestion, or that he could write or read writing in any language, and no justification for its reception in evidence can be found in the circumstances or in the writing itself. Hence, the proof did not authenticate the paper and its admission in evidence was error.

(2.) SAME.

The rule, that the withdrawal of prejudicial matter or an instruction to the jury to disregard it cures an error which may have been committed by its introduction, cannot be applied here since the statements were of a character calculated to irrevocably affect and sway the minds of the jurors and the instructions of the court did not relate to all of the statements and were not sufficiently clear and specific. It is the duty of a trial justice, having been warned by derelictions of duty committed by a counsel conducting a trial, to admonish him to restrain his acts and language within the very reasonable and liberal methods and rules fixed by law.

(3.) SAME.

The trial was rendered unfair by the use of improper and intemper-

ate arguments and statements by the counsel for the People in his summation to the jury and the judgment of conviction must be reversed.

(Argued February 1, 1916; decided April 18, 1916.)

APPEAL from a judgment of the Supreme Court, rendered April 17, 1915, at a Trial Term for the county of Erie, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

*Horace O. Lanza* and *John V. Maloney* for appellant.

It was error to admit in the People's rebuttal a written statement purporting to be made by the defendant which was characterized in the trial as a last will and testament. (People v. Pisano, 142 App. Div. 524.) It was error for the district attorney to ask the jury to deny the defendant a fair trial and also the rule of law that presumes every man innocent until he is proven guilty, for the reason that he had not accorded that principle of justice to the wife when he took her life. (People v. Pettanza, 207 N. Y. 560; People v. Smith, 172 N. Y. 212.) The misconduct of the district attorney in repeatedly attempting to excite prejudice against the defendant and his defense was intentional and prejudicial, and was not cured by any admonition from the court to the jury. (People v. Cascone, 185 N. Y. 317; People v. Acardo, 140 App. Div. 927; People v. Fielding, 158 N. Y. 542; People v. Corey, 157 N. Y. 332; Brooks v. Rochester Ry. Co., 156 N. Y. 244; People v. Hill, 37 App. Div. 327; Swan v. Keough, 35 App. Div. 80.)

*Wesley C. Dudley, District Attorney (Guy B. Moore* of counsel), for respondent.

COLLIN, J.:

The defendant was indicted and tried for the killing of his

wife and the jury found a verdict of murder in the first degree, as charged in the indictment. We are constrained by the reasons which this opinion will state to reverse the judgment of conviction.

On the tenth day of March, 1915, the defendant killed his wife, Josephine Manganaro, at the city of Buffalo, by stabbing her with a knife or dagger which had been formed from a mechanic's file. The direct proof of the killing was his statement, of such effect, contained in a confession made by him on the eleventh day of March, which was received in evidence and was not contradicted upon the trial. The defense was insanity in the form of melancholia with frenzy, and substantial evidence in support of it was received. The trial justice by a charge, correct, impartial and satisfactory to the counsel for the parties, submitted to the jury the evidence relating to the mental condition of the defendant at the time of the killing and instructed them in the law involved in the entire evidence and case.

The trial court erred, however, in receiving in evidence a certain writing which upon the trial was denominated the last will and testament of the defendant. The writing was offered by the counsel for the People and was received in rebuttal of the evidence introduced in behalf of the defendant. The direct evidence in behalf of the people, stated briefly and with sufficient accuracy and comprehensiveness, related to the identity, the condition of the body and the cause of the death of the deceased, and the killing by and deliberation and premeditation therein on the part of the defendant. The direct evidence in behalf of the defendant related to the conduct of the deceased through several months prior to March tenth, 1915, and the relations between the defendant and the deceased existing prior to and at the time of the killing, and the mental condition of the defendant at that time. In rebuttal the writing in question was received in evidence, under the adequate objection and an

exception to the ruling of the court by the defendant, as evidence bearing on the question of the sanity or insanity of the defendant at that time. It was in the Italian language and the translation of it read to the court was: "Louis from poison is about to dissolve me. My last wish is to recommend my children. You will be the father. I give them to you. Don't give any news to my family I beg you. Good-bye forever. Antonino Manganaro." Upon the envelope containing it was written in the English language: "This is last my will to Louise Mandarino, 25 Trenton Avenue, City." No evidence had been admitted or presented that the name at the end of the writing or any part of the writing was written by the defendant or by another at his direction or suggestion, or that he could write or read writing in any language. The confession of the defendant, which was detailed and circumstantial concerning his acts prior to, attendant upon and subsequent to the killing, did not mention the writing or suggest its existence. The justification for its reception in evidence, if it exists, must be found in circumstances and the writing itself. The evidence had disclosed to the court before it was received, through the cross-examination of a police officer, a witness in behalf of the People, that it was found on "the dresser" in the bedroom of the defendant and the deceased between ten and eleven o'clock in the forenoon of Thursday, the day next after the homicide. It had further disclosed that on the Friday last prior, the deceased, at the direction of the defendant, had left the two rooms in which they and their three young children lived. The deceased returned to them for the first time thereafter in the evening of the next Wednesday, a few hours before she was killed. The three children had been received by a charitable institution on the Tuesday just before. Subsequent to the removal of the children and prior to the return of the deceased with the defendant, he was the only person living in the rooms. The defendant and the deceased remained in the room until the kill-

ing, at about nine-thirty o'clock in the evening. The defendant remained there with the body until about seven o'clock the next morning, when he locked the rooms and went to the hospital, on account of self-inflicted injuries. He within the three months last prior to the homicide had, on two or more occasions, appealed to or consulted Louis A. Mandarino, who was his brother-in-law, concerning the acts and conduct of the deceased. The counsel for the People asserts, erroneously, however, that in those circumstances and the writing proof existed that the instrument was written by the defendant.

The question of the admissibility of the writing in evidence was one for the trial justice to decide. Under the evidence and the defense, the writing was not competent evidence unless it was written by the defendant, and written, as stated by the counsel for the People, " shortly before or shortly after the homicide." The trial justice, in reaching his decision, was bound by the relevant rules of evidence and law. It was not admissible unless and until sufficient evidence had been presented, either direct or circumstantial, to legitimately satisfy him that the defendant was its author. It is a fundamental rule that, in general, all private writings must be proved to be genuine before they are admissible in evidence. The genuineness may be proved by indirect or circumstantial evidence the same as many other facts; but the circumstantial evidence, in the present case, and as a general rule, must be of such a force and character that defendant's authorship of the writing can be legitimately deduced from it. · It must, with reasonable and natural certainty and precision, compel the conclusion that defendant wrote the document, and exclude the conclusion that it was the product of another. It must force or induce the mind to pass beyond a suspicion or conjecture that the defendant was the author. Suspicion is not proof, nor conjecture evidence, upon which courts can act in determining the rights of parties. The writing was not found in the possession of the

defendant. The evidence does not prove when or how or by whom it was placed upon the dresser. Neither the fact that the name of the defendant was written at its end, nor the fact that it was found in the room which the defendant had occupied created the presumption that he was its author. The proof did not authenticate it and its admission in evidence was error. (People v. Corey, 148 N. Y. 476; O'Connor Mining & Manfg. Co. v. Dickson, 112 Ala. 304; Myrick v. United States, 219 Fed. Rep. 1; Palmer v. Manning, 4 Denio, 131; Mann v. Forein, 166 Ill. 446; Sweeney v. Ten Mile Oil & Gas Co., 130 Pa. St. 193.)

We have already stated that the writing was admitted by the court in rebuttal of defendant's evidence, as evidence upon the question of the sanity or insanity of the defendant. It, therefore, bore upon the paramount issue between the People and the defendant. Furthermore, the counsel for the People in his summation to the jury used it for an additional purpose in this language: "Now, is it necessary, gentlemen, for me to take any more time to show you that this man, when he killed this woman, intended to do it, premeditated upon it and committed all those acts with the definition of murder in the first degree, as you will receive it from the Court; that he is guilty of that crime. One other fact, gentlemen, right in that connection: Now, the defendant says that after he killed this woman that he took this poison. * * * He says it put him out of his senses; but, gentlemen, he could not have written a letter after he did that; he could not have written a letter after he cut himself in the arm, because if he had, there would have been blood on this envelope and this letter. Do you not suppose he wrote this letter before he got that woman back to the house? He did not write it after he got back, because she would have seen him. If he wrote that letter before he got that woman back to the house that night, calling it his last will, and asking his brother-in-law, Louis Mandarino, to take care of those children, does

it not show he realized the fact that those children were going to be left without a father and mother? You see, he had no right, if the mother remained alive, he could not give the consent to take those children. Did it not show he made up his mind to kill this woman and then did so with deliberation? Gentlemen, if he wrote that letter before he got that woman back to the house, indicating that he knew those children were going to be fatherless and motherless, is not that strong, convincing and compelling proof to your minds that he had premeditated the murder of this woman; that he had deliberated it, and that he is guilty of murder in the first degree: " While we always consider and obey the statutory direction to give judgment in criminal cases without regard to technical errors, which do not affect the substantial rights of the parties (Code of Criminal Procedure, § 542), the direction is not applicable to this case.

The trial was rendered unfair by the use of improper and intemperate arguments and statements by the counsel for the People, the assistant district attorney, in his summation to the jury. The trepasses of the counsel in such regard, in and of themselves, might constitute ample cause for reversing a judgment of conviction. People v. Watson, 216 N. Y. 565.) To justify our conclusion, as stated, we refer with particularity and precision to certain parts of his summation, as follows: " A lawyer has got to be frank and fair. He cannot fool a jury. He cannot fool a jury any more than these learned doctors, who come in here as experts, with their brain storms and twilight states, trying to fool jurors. Oh, they have tried it so often! I have seen lawyers try it, gentlemen. Oh, I have seen these doctors try it, but you get twelve intelligent men like you gentlemen and you cannot fool them. Why, gentlemen, you would be feeble-minded if you could." And again. " Oh, gentlemen, it is laughable but is it not pitiable, a noble profession devoted to the curing of ills, to the saving of lives, and

a few of these gentlemen, money-mad, prostituting that profession, dragging it into the mire and filth of mere money making, not hesitating to commit perjury if it will put a fee into their pocket, and not only that, gentlemen, but dragging into disgrace and into contempt the administration of justice in the courts of this state." And again: "Gentlemen, you cannot afford to have it go out of the court room to men of the defendant's class, to other people in this community, that if they have trouble with their wives, or anybody else, or if they are unhappy over those troubles that they can deliberately take a knife and murder that person and then escape the consequences of a crime by going to state's prison for a period of years, or by going to an insane asylum that depends upon the length of their insanity." And again: "What does he do? He himself becomes a grand jury that indicts that woman for adultery; he becomes the district attorney that prosecutes her; he is the evidence that convicts her of adultery. He is a jury that passes on her guilt and convicts her and then he sentences her to death. But he comes to the jury and asks, ' Give me a fair trial; give me the advantage of every technicality the law allows. You must presume that I am innocent. Do not send me to the death chair.' And yet he sends his wife to a terrible death because she committed adultery." The counsel repeatedly stated, in effect, that the three physicians, who testified as experts in behalf of the defendant, committed perjury and, in order to earn their fees or secure " graft," attempted to fool or deceive the jury; that the jurors would be deceived or feeble-minded if they believed the testimony of the physicians. He told the jury that under a verdict in favor of the defendant the defendant would go to Matteawan hospital to remain only so long as his insanity lasted and that the physicians were careful to say that they did not know just how long it would last; and, in effect, that the jurors could not afford to find a verdict for the defendant. The statements and arguments

of the character of those we have given were, manifestly, improper and unfair. The interests of the People as well as those of the defendant require that the trial of an accusation should be had according to law. The safety and security of every citizen requires that if one accused cannot be fairly and lawfully convicted, he should not be convicted at all. The instruction to the jury to disregard certain of the statements of the counsel did not transform their pernicious character or eradicate their unjust effects. The rule that the withdrawal of prejudicial matter or an instruction to the jury to disregard it cures any error which may have been committed by its introduction, cannot be applied here, and for two reasons: The one, the statements were of a character calculated to irrevocably affect and sway the minds of the jurors; the other, the instructions of the court did not relate to all of the statements and were not sufficiently clear and specific. It is the duty of a trial justice, having been warned by derelictions of duty committed by a counsel conducting a trial, to admonish him to restrain his acts and language within the very reasonable and liberal methods and rules fixed by law. (People v. Fielding, 158 N. Y. 542; Throckmorton v. Holt, 180 U. S. 552, 567; Loughlin v. Brassil, 187 N. Y. 128; People v. Conrow, 200 N. Y. 356.)

For the reasons stated, the judgment of conviction should be reversed and a new trial ordered.

WILLARD BARTLETT, Ch. J., HISCOCK, CHASE and HOGAN, JJ., concur; CARDOZO and SEABURY, JJ., dissent.

Judgment of conviction reversed, etc.