THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JULIO MUNOZ, Defendant-Appellant.

First District (2nd Division)    No. 77-1780

Opinion filed March 13, 1979.—Rehearing denied April 17, 1979.

John J. Burns, of Chicago (Robert P. Sheridan, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Mary Ann Callum, and Terry Gillespie, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE STAMOS delivered the opinion of the court:

Defendant, Julio Munoz, was charged with the armed robbery (Ill. Rev. Stat. 1975, ch. 38, par. 18—2) and murder (Ill. Rev. Stat. 1975, ch. 38, par. 9—1) of Peter Mobiles. Defendant was tried on both charges by a jury and found guilty. Defendant was sentenced to the Illinois Department of Corrections for the consecutive terms of not less than 8 years nor more than 16 years for armed robbery and not less than 75 years nor more than 150 years for murder.

Defendant presents for our review issues concerning (1) the alleged erroneous admission into evidence of a letter and (2) whether the evidence adduced at trial was sufficient to prove defendant guilty beyond

a reasonable doubt. Prior to discussing the issues presented for review, we will summarize the evidence.

Eugene Krupa testified that he resides at 1713 N. Campbell, Chicago, Illinois, with his mother and sister. He resided there on December 16 and 17 of 1975.

Krupa stated that on the morning of December 17, 1975, his niece entered his dwelling to inform him that an automobile was obstructing the driveway. Krupa exited his home and approached the automobile which he described as a white, two-door Oldsmobile Cutlass. Krupa observed some blood, a sock and a shoe underneath the automobile. Upon looking into the automobile, Krupa observed a body lying across the front seat. Krupa immediately returned to his home and called the Chicago Police Department. Subsequently, a squad car arrived at Krupa's home.

Ronald Grimes, an officer with the Chicago Police Department, next testified. Grimes was assigned to the Shakespeare District and was on uniformed duty the morning of December 17, 1975. Grimes was patrolling in a marked squad car.

Grimes received an assignment indicating that an injured man was located in an automobile at 1713 N. Campbell, Chicago, Illinois. Grimes arrived at that address and observed a white, two-door 1964 Oldsmobile Cutlass parked at 1713 N. Campbell. The automobile was obstructing the driveway. Grimes observed a man lying across the front seat of the automobile. The body was clothed in undershorts and an undershirt. The individual's head was toward the passenger side. Grimes further observed a large quantity of blood in the automobile near the individual and noticed a sock and shoe outside the automobile.

Grimes testified that a door to the automobile was ajar. He opened the door and felt the pulse of the individual inside the car. There was no pulse and the flesh of the individual was cold.

Grimes then called the mobile crime laboratory and homicide investigators. The crime lab arrived and conducted an investigation. The lab fingerprinted the body and photographed the vehicle and the surrounding area. Grimes stated that the lab then "processed" the body and collected the shoe and sock. These items were photographed, placed into plastic bags and inventoried.

James Kosmides, the owner of a coffee shop at 2615 W. Lawrence, Chicago, Illinois, also testified. He stated that Peter Mobiles, the victim, was in Kosmides' establishment on December 16 and 17 of 1975.

Kosmides, Mobiles and Louis Katsoginanis were in Kosmides' coffee shop from midnight December 16 until 3 a.m. December 17, 1975. At that time a young blonde woman appeared outside the window of the shop. The three men exited the shop upon observing the woman. Kosmides

stated that Katsoginanis spoke with the woman in a nearby hallway concerning sexual activities and prices.

Kosmides indicated that Mobiles brought his automobile to the side door. Mobiles drove a white Cutlass Supreme. Mobiles, Katsoginanis and the woman, together in the automobile, departed the area of the coffee shop.

Kosmides stated that on December 16 and 17 of 1975, Peter Mobiles was in good health. At 8 a.m. on December 17, 1975, two police officers spoke with Kosmides and told him that Peter Mobiles was dead.

Deborah Schak, defendant's accomplice, next testified, detailing the activities preceding, during and following the robbery and murder of Peter Mobiles. Schak was charged by information with armed robbery and murder. She had been incarcerated since the end of December 1975.

Schak stated that she began living with defendant in October of 1975. While living with defendant until mid-December, 1975, she had used heroin. During October of 1975 she was participating in a methadone program. Schak and defendant lived together at 1737 N. Maplewood, Chicago, Illinois.

Early in the morning on December 17, 1975, at approximately 1 a.m., Schak, Victor Figueroa, Ralphie Munoz and defendant had a conversation wherein Schak stated that she needed money to pay her methadone program charges. She told defendant that she would steal or prostitute herself. If she found someone with money, she would bring him back and rob him.

Schak testified that defendant and she agreed on a plan. Defendant stated that a gun could be utilized. She and defendant departed defendant's residence and walked two blocks to Western Avenue. Schak then was driven from Western Avenue to the 2600 block of Lawrence Avenue. She exited the automobile and began walking. She subsequently met three men, two of whom were named Louis and Peter.

Schak told the men she needed money and they discussed the price for sexual activities. She, Louis and Peter proceeded to Louis' residence. She then engaged in sexual activities with Louis for money. Schak and Peter then discussed the possibility of spending the night together at Schak's sister's home. Peter agreed and was to pay Schak $100. Schak testified that Peter showed her a large sum of money and indicated that he could afford the fee.

Schak and Peter Mobiles then drove in Mobiles' automobile to Campbell and Wabansia streets. Mobiles then parked the automobile and at that point was approximately 1½ blocks from defendant's residence.

Schak testified that she next told Mobiles that she would ask her sister if Mobiles and Schak could stay together. Schak entered defendant's residence and told defendant that she had somebody with money.

Defendant descended some stairs with a gun in his possession. Schak entered the kitchen and obtained a knife which she placed in her waistband. Schak and defendant then exited defendant's residence and proceeded to Mobiles' automobile.

When Schak and defendant met Peter Mobiles he was standing outside of his automobile. Schak testified that she then asked Mobiles to give her friend (defendant) a ride to Foster and Sheridan.

Mobiles entered the automobile on the driver's side. Schak entered the back seat and defendant entered the front passenger seat. Defendant then placed his gun against Mobiles' head and directed Mobiles to give defendant money. Schak then placed her arm around Mobiles' neck and held her knife to Mobiles' throat. Mobiles then handed defendant approximately $20.

Schak stated that she told defendant that Mobiles had more money than the amount given to defendant. Defendant then directed Mobiles to remove his suit. Mobiles complied and defendant placed the clothing outside of the automobile on the passenger side.

Defendant then opened the passenger door and allowed Schak to exit the back seat. Schak testified that defendant directed Mobiles to lie down for 10 minutes. Schak exited the automobile after hearing defendant direct Mobiles to lie down. She then heard a gun shot. Schak testified that she turned and saw Mobiles' head hit the front of a seat and saw defendant holding a smoking gun. Defendant told her that the shooting of Mobiles was an accident.

Schak and defendant picked up the suit jacket and returned to 1737 N. Maplewood. At 4 a.m., Schak, Ralphie and defendant conversed. Ralphie asked defendant if defendant killed Mobiles and defendant shrugged his shoulders and looked at the gun in his waist.

Schak testified that she and defendant returned to Mobiles' automobile. Mobiles was making "gargling noises" and Schak, upon observing a large quantity of blood, shut the door of the automobile lightly. She picked up Mobiles' pants and with the sleeve of her jacket she wiped the door handle.

Schak and defendant then collected the remainder of Mobiles' clothing and returned to defendant's residence. Fifty dollars were found in the clothing. Schak and defendant exited defendant's residence and proceeded to an alley. There Schak placed Mobiles' clothing under a mattress and defendant placed the gun under some boards. Schak testified that she then told defendant that she believed Mobiles was dead. Defendant responded by stating that "it's probably better that way."

Schak then testified concerning a trip to the Illinois Training School for Boys at St. Charles, Illinois. Defendant, Ralphie, Victor, Schak and an

unnamed driver took this trip on December 17, 1975, at 10 a.m. Prior to departing for St. Charles, defendant had retrieved his gun and placed it under the seat in the automobile. Defendant's son was a resident in St. Charles.

Defendant and Schak visited defendant's son. Conversations were had and defendant then told Schak, "Don't worry about it, they won't catch you." Schak testified that defendant had informed his son of the death of Mobiles.

After departing St. Charles for Chicago, defendant instructed the driver to stop the automobile. Defendant took his gun, walked out into a large open field and approximately two minutes later returned without the gun.

Schak testified that she was taken into custody on December 25, 1975. Police told Schak that she was under arrest for murder and armed robbery. Schak did not tell police that defendant was responsible for the murder. Instead, Schak implicated an individual named Lazaro Hernandez and described the automobile used inconsistently with a description of Mobiles' automobile.

Police administered a polygraph test to Schak. Schak was told that she failed the test and that Schak's girlfriend, Karen Shea, would not support Schak's version of the incident. Schak then related another version of the incident to the police and an assistant state's attorney. Schak stated that she was involved but did not witness the shooting. Schak did name defendant but did not state that defendant shot Peter Mobiles.

On cross-examination Schak admitted her use of heroin. She admitted to have prostituted herself before this occasion. Schak stated that she had stolen money from male customers. She noted that she was taking methadone but whenever she would leave the program she would return to heroin use. The last time she used heroin was the week prior to Christmas, 1975.

Schak further testified that defendant's gun had ".357" inscribed on the barrel. She indicated that at the time of the robbery and murder she was under the influence of methadone.

Louis Katsoginanis testified that he lives at 4765 N. Virginia, Chicago, Illinois. He knew Peter Mobiles for 3 years. Katsoginanis worked at a restaurant on Lawrence Avenue and went to Kosmides' coffee shop at 2 a.m. on December 17, 1975. Mobiles was in the coffee shop. The men saw a blonde woman on the street outside of Kosmides' shop. Mobiles and Katsoginanis exited the shop and Katsoginanis and the woman discussed the cost of a "date." Katsoginanis, Mobiles and the woman then departed for Katsoginanis' residence. Subsequently, Mobiles and the woman departed.

Dr. Eupil Choi, M.D., testified that he is a physician licensed to practice medicine in the State of Illinois. He is employed by the coroner's office as a forensic pathologist.

Dr. Choi conducted a post-mortem examination of Peter Mobiles. Dr. Choi identified a bullet wound on the right side of Mobiles' forehead. The bullet was fired from extremely close range and penetrated the brain tissue. Dr. Choi recovered the bullet from inside Mobiles' skull. Dr. Choi testified that the cause of death was a gunshot wound to the head with the bullet passing through the brain. Mobiles' death was instantaneous.

Victor Figueroa, 16 years of age, testified that he had been living with defendant in December of 1975. Figueroa identified defendant in court. He stated that at 5 a.m. on December 17, 1975, he was sleeping in the basement of defendant's residence when defendant, Ralphie and Schak entered the residence. Schak's mascara was smeared, defendant's hair was disheveled and both were breathing in a labored manner. As defendant went upstairs to his room he hid the gun. Figueroa testified that Ralphie then told him what had occurred.

Figueroa then referred to the visit to St. Charles, Illinois. Figueroa remembered that while returning to Chicago, defendant exited the automobile, hid his gun in a field, and returned to the automobile. The gun was the same gun seen the night before by Figueroa.

Pamela Abbott testified that she knew Schak and saw her the weekend prior to Christmas of 1975. Abbott saw Schak again thereafter at defendant's residence. Abbott stated that at that time Schak was "high," intoxicated and crying. Abbot further testified that defendant stated to her, "If there's any leaks outside or any of this gets back, that [Abbott] would be next." Abbott related that she then ran from defendant's residence.

James Lanners testified that he is an investigator for the Chicago Police Department, homicide section. Lanners was assigned to investigate the death of Peter Mobiles. Lanners had a photograph of Deborah Schak and showed it to Jimmy Kosmides and several of Kosmides' customers. They were able to identify the photograph.

Lanners stated that on Christmas night of 1975, he entered 1737 N. Maplewood and found six or seven people there, including Schak, Figueroa and defendant. Lanners then identified defendant in court.

Lanners took all those present into custody. Lanners stated that Karen Shay took a polygraph examination. Shay told Lanners that Schak asked Shay to lie for Schak. Shay told Lanners she would not do so. In Schak's presence Shay then reiterated her decision not to fabricate a story. Lanners then obtained certain different or additional information from Schak.

On December 29, 1977, Lanners interviewed defendant. Lanners

advised defendant of his rights and told defendant that a statement was given by Deborah Schak which implicated defendant.

Lanners further testified that he had been unsuccessful in locating the clothing of Peter Mobiles. Lanners also could not locate the .357 gun.

Charles Jackson testified that he is a Mobile Unit Technician for the Chicago Police Department crime laboratory. Jackson investigated the scene at 1713 N. Campbell on December 17, 1975. Jackson photographed the automobile and examined the body. Jackson observed a laceration on the left thumb of the body and puncture wounds on both hands. He found blood in and outside the vehicle and removed blood and fingerprint samples. Jackson also examined the vehicle at 14th District police station and found metal fragments on the vehicle floor.

Frank Musial testified that he is an Area 5 homicide investigator for the Chicago Police Department. On December 18, 1975, Musial was at the Institute of Forensic Pathology at the Cook County Hospital. There he was given an envelope by Dr. Choi. Musial took the envelope to the Chicago Police Department crime laboratory, firearms section.

Ernest Warner testified that he is a firearms examiner for the Chicago Police Department. On December 19, 1975, Warner came into possession of several metal fragments in relation to a particular homicide case. The fragments were delivered to Warner in a blue envelope. Warner signed his name upon the envelope, dated it and cut the envelope open through the name and date.

Warner found a bullet core and bullet jacket. He also received three small metal fragments. He identified these fragments as components of a .38-caliber bullet. Warner testified that a .38-caliber bullet can be fired from .38-special revolvers or .357-magnum revolvers. In this case Warner received no gun for comparison.

Riccardo Rodriguez testified that he was at defendant's residence on December 16 and 17 of 1975. Rodriguez stated that in the morning hours of the 16th and 17th he saw defendant in bed for several hours.

Defendant contends that a letter received by Deborah Schak was erroneously admitted into evidence by the trial court. This letter reads as follows:

"Debby,

How are things with you? I realize that they are not cool being in jail and all that, but these are only the dark side of things. Perhaps there may be brighter days ahead, only time will tell.

I want you to know that in spite of our adversity (bad times) I miss you and deeply care. Somehow we must find a way out of this but it will have to be together, simply because in unity there is strength.

Debby, I know that you signed that statement against me and I

also realize that your were under a lot of pressure when you did this. So for that you are forgiven, but you can also help me to get out of this mess by simply saying that you were under police pressure when you made the statement against me and just simply change your story in court.

By the way playboy is out on the street and I don't think he was the one who told them about Geneva, but it really doesn't make any difference who said it, the cat is out of the bag (if you know what I mean). What is important is that you don't turn against me in court.

I am enclosing my number and address, 7512454, C-1.
What is the name you are under?

Love tu papi<br>Compa

As you can see I miss you and in spite of everything I still love Debbie * * *. Can you understand this I wish you warmth and well.

tu papi<br>Compa"

This letter was received by Deborah Schak while she was incarcerated at the County Jail. She testified that she had previously received approximately 20 or 30 letters signed with the name "Compa" and including cell number 7512454.

The State notes that Pamela Abbott, Victor Figueroa and Deborah Schak testified that defendant was known by the name "Compa." Furthermore, the State indicates that the record on appeal reflects that defendant was incarcerated in cell number 7512454, C-1 prior to and at the time of the trial. The State concedes that defendant did not actually transcribe the letter but relied upon an amanuensis and contends that defendant's authorship is evident.

Essentially, the letter's admission into or exclusion from evidence relates to the concept of authentication. This concept concerns the proof of authorship of, or other connection with, writings. See generally McCormick on Evidence ch. 22 (2d ed. Cleary 1972).

■■ In the case at bar, direct proof of authorship was not offered; but authentication by circumstantial evidence is uniformly recognized as permissible. McCormick on Evidence §§222-226 (2d ed. Cleary 1972). Accord, Wharton's Criminal Evidence §525, at 19 (13th ed. C. E. Torcia 1973).

Our approach to the problem at bar regarding the authentication of a private writing cannot overlook "that fraud, mistake, or undue jury

credulity are omnipresent possibilities, nor can it be denied that effective measures are desirable to minimize or eliminate the possible effect of these factors on the litigation process." (Strong, *Liberalizing The Authentication of Private Writings*, 52 Cornell L.Q. 284, 287 (1967).) One such measure has been the establishment of a standard against which questioned writings may be compared.

Standards for the authentication of private writings have been enunciated in varying degrees of strictness and liberality. The most stringent standard for the admissibility of a private writing has been enunciated by the Court of Appeals of New York in *People v. Manganaro* (1916), 218 N.Y. 9, 112 N.E. 436. (See generally Annot., 131 A.L.R. 301 (1941).) In *Manganaro*, that court stated (218 N.Y. 9, 13, 112 N.E. 436, 438):

> "It is a fundamental rule that, in general, all private writings must be proved to be genuine before they are admissible in evidence. The genuineness may be proved by indirect or circumstantial evidence the same as many other facts; but the circumstantial evidence, in the present case, and as a general rule, must be of such a force and character that defendant's authorship of the writing can be legitimately deduced from it. It must, with reasonable and natural certainty and precision, compel the conclusion that defendant wrote the document, and exclude the conclusion that it was the product of another. It must force or induce the mind to pass beyond a suspicion or conjecture that the defendant was the author. Suspicion is not proof, nor conjecture, evidence, upon which courts can act in determining the rights of parties."

Dean Wigmore also offers an approach potentially applicable to the case at bar. In his treatise Wigmore states:

> "Accordingly, it seems generally conceded that the mere *contents of a qritten communication*, purporting to be a particular person's, are of themselves not sufficient evidence of genuineness. Only in special circumstances, where the contents reveal a *knowledge* or other trait peculiarly referable to a single person, could the contents alone suffice." (Emphasis in original.) 7 Wigmore on Evidence §2148, at 606 (3d ed. 1940).

Rule 901(b)(4) of the Federal Rules of Evidence reveals the most liberal approach to the authentication of private writings. Rule 901, subsequently to be analyzed in detail, provides in pertinent part:

> "(a) General Provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.
>
> (b) Illustrations. By way of illustration only, and not be way of

limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

\* \* \*

> (4) Distinctive characteristics and the like. Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances."

With these standards in mind, we note that various cases cited by the State are inapplicable to the case at bar. Cases concerning ancient documents (*Bradley v. Lightcap* (1903), 202 Ill. 154, 66 N.E. 546), public records (*Department of Conservation v. First National Bank* (1976), 36 Ill. App. 3d 495, 344 N.E.2d 11), and written replies to letters or telegrams previously sent (*Eastman v. United Marble Companies* (1922), 224 Ill. App. 256; *L. W. Hubbell Fertilizer Co. v. Jacobellis* (1915), 195 Ill. App. 410 (abstract)) do, indeed, concern authentication by circumstantial evidence. However, the principles enunciated in these cases add nothing to the standard to be applied in the case at bar. Therefore, we believe that these cases merit no further discussion.

Professor Broun's article, *Authentication and Contents of Writings*, 1969 Law & Soc. Order 611, 624-34, comments on the Preliminary Draft of the Proposed Federal Rules of Evidence. The following comments, distilled from Professor Broun's article, are worthy of note:

> 1. A finding of authentication is nothing more than a finding that there is sufficient evidence to justify the presentation of the offered evidence to the trier of fact.
>
> 2. The opponent is never precluded from contesting genuineness even after basic authentication requirements are satisfied.
>
> 3. The rule should serve to prevent unnecessary exclusion of evidence.
>
> 4. 901(b)(4) preserves the holdings of those cases that have permitted the admission of evidence authenticated only by circumstantial factors.
>
> 5. Doctrines such as that which permits authentication by a showing that a document discloses knowledge that only the purported signer would be likely to have clearly survive.
>
> 6. The broad language of the illustration would also give the Federal courts needed flexibility in their application of the authentication requirement generally.

The liberality and flexibility of the Federal Rules referred to by Professor Broun are illustrated by cases arising under Rule 901(b)(4). In *United States v. Wilson* (8th Cir. 1976), 532 F.2d 641, *cert. denied* (1976), 429 U.S. 846, 50 L. Ed. 2d 117, 97 S. Ct.128, three defendants appealed from their convictions for conspiracy to distribute heroin. The drug

transactions were recorded in code in two notebooks by one of the defendants or by an unindicted co-conspirator. At trial, a police detective was permitted to read the contents of the notebooks to the jury. An authentication problem was presented. The notebook entries were hand printed by one or more persons. The government represented that it did not know the identity of the author.

The Court of Appeals found a *prima facie* showing that the declarant was a member of the drug conspiracy charged in the indictment. The court indicated that the contents of the notebooks referred to activities and were characterized by a code of which only *someone* connected with the transactions would have known. The writer used nicknames of the individuals involved. The writer was obviously familiar with the procedures used by the defendants in their drug operation. The court then stated (532 F.2d 641, 645):

> "Although the precise identity of the declarant is unknown, we think there was at least a *prima facie* showing that the declarant was a member of the drug conspiracy charged in the indictment."

The court, in reaching its decision upon authentication, relied, to some extent, upon 5 J. Weinstein & M. Berger, Weinstein's Evidence par. 901(b)(4) [01], at 46. These commentators note:

> "For this principle to operate the [writing] must deal with a matter sufficiently obscure or particularly within the knowledge of the persons corresponding so that the contents of the [writing] were not a matter of common knowledge.
>
> The evidential hypothesis in the authentication step is this: only those who knew the details in the [writing] could have written it; if the purported writer can be shown to have probably known the details and if no other person is likely to have known them when the [writing] was written, it is likely that he wrote it. The force of the inference decreases as the number of people who know the details and may have written the [writing] increases. Moreover, if there is a serious question of forgery, the inference is subject to being rebutted by the possibility that the details were added by someone to give an air of verity to the document rather than by the purported author who obtained the information in the usual way."

It is significant that, aided by the aforementioned comments, the court in *Wilson* found it sufficient that the author was one of a group of potential authors. The specific author was never identified. The court did not require such specific identification for purposes of authentication.

The liberal nature of Rule 901(b)(4) is further illustrated by a statement of authentication requirements attributed to the United States Court of Appeals for the Second Circuit. In *United States v. Natale* (2d

Cir. 1975), 526 F.2d 1160, *cert. denied* (1976), 425 U.S. 950, 48 L. Ed. 2d 193, 96 S. Ct. 1723, that court stated (526 F.2d 1160, 1173):

> "Proof of the connection of an exhibit to the defendants may be made by circumstantial, as well as direct, evidence. The prosecution need only prove a rational basis from which the jury may conclude that the exhibit did, in fact, belong to the [defendant]."

The *Natale* court was concerned with the authentication of a notebook containing apparently incriminating records of usurious transactions.

Reliance upon the Federal Rules of Evidence is helpful in our endeavor to resolve the authentication problem at bar. As in the *Wilson* case, we are unable to determine, with precision, the identity of the author of the letter received by Deborah Schak. This letter contains information known to a number of individuals. Defendant's cell number is a matter of public record. Three witnesses were able to identify defendant by the name "Compa." Four individuals, including defendant, participated in the journey to Geneva, near St. Charles, Illinois. This journey was referred to in the letter received by Deborah Schak. Consequently, we are faced with circumstances similar to those which confronted the United States Court of Appeals in *Wilson*. We know, with reasonable certainty, that the letter received by Deborah Schak was written by one of a small group of individuals, including defendant. We cannot, however, be certain that defendant authored the letter.

■■ ■ We do not restrict ourselves to the position recited in *People v. Manganaro* (1916), 218 N.Y. 9, 112 N.E. 436. We do not believe it necessary that in proving *prima facie* authorship, the authorship of all others beyond the purported writer must be disproved. Furthermore, any standard for authentication which requires that information contained in a private writing be peculiarly referable to a single person (7 Wigmore on Evidence §2148, at 606 (3d ed. 1940)) is, likewise, overly restrictive.

■■ Consequently, we are satisfied that the letter received by Deborah Schak was properly admitted into evidence. The fact that the letter appeared to emanate from defendant's cell coupled with the signature with defendant's nickname and the inclusion of information known to defendant *prima facie* connects the writing to defendant. The ultimate issue of authorship was for the jury.

■■ Defendant also argues that he was not proved guilty beyond a reasonable doubt. We disagree. Certainly, the testimony of Deborah Schak was particularly damaging to defendant. However, the testimony of Victor Figueroa was corroborative of Schak's testimony and described the events following the murder of Peter Mobiles, including the trip to St. Charles, Illinois, and the hiding of the gun by defendant. Without finding the necessity of repeating the aforementioned testimony

adduced at trial, we are of the belief that the evidence was sufficient to prove defendant guilty beyond a reasonable doubt.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

PERLIN and HARTMAN, JJ., concur.