No. 3--03--0671

______________________________________________________________________________

IN THE APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2005

THE PEOPLE OF THE STATE OF )

ILLINOIS, ) Appeal from the Circuit Court

Plaintiff-Appellee, ) for the 9th Judicial Circuit,

) Knox County, Illinois

) 

v. ) No. 01–CF–186

) 

NICHOLAS J. DOWNIN, ) Honorable

Defendant-Appellant. ) Stephen Mathers

) Judge, Presiding 

______________________________________________________________________________

JUSTICE O’BRIEN delivered the opinion of the court:

______________________________________________________________________________

Following a bench trial, defendant Nicholas Downin was found guilty of three counts of aggravated criminal sexual abuse. 720 ILCS 5/12-16(d) (West 2002).  The court sentenced Downin to a 60 day term of incarceration, a $1,000 fine, and a 30 month term of probation.  Downin appeals his conviction and sentence.  We affirm the trial court. 

FACTS

 Defendant Nicholas Downin was charged under the Illinois Criminal Code of 1961 (the Code) with nine counts of aggravated criminal sexual abuse.  720 ILCS 5/12-16(d) (West 2002).  The counts alleged that when Downin was at least 5  years older than the alleged victim, Jennifer, who was at the time at least 13 years of age, but under 17 years of age, Downin had sexual intercourse with Jennifer on several different occasions.  A bench trial was held and the following testimony presented.  

Jennifer testified she first met Downin in an Internet chat room when she was 15 years old.  She communicated with him through the address 
nickd@galesburg.net
.  In February of 2000, Jennifer met Downin in person when he came to her house. Jennifer stated that initially she and Downin treated each other as brother and sister, however, their feelings toward each other began to change the week of January 17, 2001.  Jennifer testified she and Downin first had sexual intercourse in her bedroom on January 24, 2001, sometime after midnight. Jennifer stated with specificity several other dates on which she and Downin had sexual intercourse, including January 25, 2001, in her home.  Jennifer further testified to intercourse with Downin on January 26, 27, 28, 29, and February 4, 8, and 10, 2001. The intercourse of January 26 took place in Downin's home in the afternoon after Downin picked Jennifer up from school using his mother's car. Jennifer testified that the other incidents that occurred in her home took place generally around midnight, sometimes in front of the fireplace. Jennifer stated that during the time she had a sexual relationship with Downin her dad usually slept in the living room.  Jennifer stated the room was fairly large and her father's bed was located on the far  wall about 15 feet from the fireplace.  Jennifer testified that her father would generally go to sleep around 9 or 10 o'clock.  Jennifer stated her father had a sleeping disorder and "[h]e was out as soon as he fell asleep."  Jennifer testified her mother would sometimes stay awake until 2 or 3 o'clock in the morning.  Her mother slept in a bedroom separated from Jennifer's bedroom by a connecting bathroom. Jennifer habitually kept the door to her bedroom closed.

Jennifer stated she was aware of the dates she and Downin had sexual intercourse because she noted the incidents as they occurred in a calendar she later provided to Knox County sheriff's deputy David Caslin.  The calendar was introduced as evidence.  Jennifer testified that an entry in her calendar on the date of February 7, 2001, indicated her cat had died.  Jennifer stated this event was significant in her life and she recalled Downin was present in her home on that date and comforted her in front of her mother.  Jennifer stated that in mid-February, her mother discovered the sexual nature of her relationship with Downin and forbade Jennifer from seeing him again.  Jennifer continued to have contact with Downin via e-mail and telephone.  The e-mail address she used to reach Downin was the same one through which she had always contacted him.

Jennifer testified that after her mother contacted them, Jennifer provided the police two pairs of underwear she had worn on days she had intercourse with Downin.  Jennifer testified she was still in possession of her soiled underwear because her room was messy and she gathered laundry on an as-needed basis.  Forensic experts testified that the DNA profile of a sperm sample on one of the pairs of underwear matched the DNA profile of Downin.  DNA on the same pair of underwear also matched Jennifer's profile.  Jennifer later met with Deputy Caslin and at his instigation sent an e-mail to Downin.  Jennifer testified she received no notification that the e-mail had been improperly transmitted.  A copy of her communication was introduced as evidence.  Also introduced was a copy of a transmission Jennifer testified was the response to her e-mail that she received from Downin's e-mail address.  Jennifer testified this communication was responsive to her e-mail and contained information that would be known exclusively to Downin.  At trial, Jennifer read from the copies of the e-mail transmissions. In the e-mail that Caslin prompted, Jennifer indicated she was under a lot of stress and was considering telling her mother about the sexual relationship.  She requested that the recipient let her know his thoughts. The response e-mail contained admissions of a sexual relationship.  

Jennifer testified that from January of 2000 to the date of trial she suffered from depression for which she had seen a psychologist and had been prescribed medication.  She could not recall if she had been consistently taking her medication during January and February of 2001.  Jennifer testified that Downin's family kept their front door unlocked.  She denied removing a used condom from Downin's house or telling Summer Knuth that she had done so.  Jennifer also denied speaking to Ashlee Giles about a movie titled, "Crush."  Jennifer admitted using Downin's user name and password to access the Internet during a time when her parents had denied her access.

Dave Caslin of the Knox County sheriff’s department testified that he met with Jennifer on April 12, 2001, to investigate allegations of criminal sexual abuse against Nicholas Downin. During his investigation, Caslin determined that in January and February of 2001, Downin was 22 years and 3  months of age and Jennifer was 16 years and 3 months of age.  The difference in their ages was six years and one month. After meeting with Jennifer, Caslin requested she attempt to communicate with Downin via e-mail, a method of communication Caslin testified he understood the two had used in the past.  Caslin provided Jennifer with access to the Internet through a computer located in the public safety building where they met.  Caslin identified a printout of an e-mail communication he testified he observed Jennifer send to the address, 
nickd@galesburg.net,
 an address Jennifer provided.  Caslin identified a printout of an e-mail response forwarded to him via e-mail from Jennifer.  Caslin also identified a calendar he received from Jennifer. Caslin testfied he did not confiscate either Jennifer's or Nicholas' computer. 

Jennifer's mother,  Joann, testified.  Joann stated that Jennifer's birth date was November 24, 1984.  Joann testified that she met Downin in the fall of 2000 when Jennifer was 15 years old and Downin was about to turn 22 years old.  Joanne testified that she told Downin at the time that because of their age differences, Downin and Jennifer could only be friends.  Thereafter, Downin spent a considerable amount of time at Joann's home.  Joann characterized his relationship with Jennifer as initially like brother and sister.  Around the end of February of 2001, Joanne became concerned about the nature of Downin and Jennifer's relationship.  Her concern was based on her observation of Downin's change in behavior toward Jennifer.  Joann testified that she observed Downin comfort Jennifer when her cat died by caressing her face.  She also saw Downin touch Jennifer's "private parts."  She did not observe any actual sexual contact between the two.  In early March of 2001, Joanne forbade Downin from seeing Jennifer again until she turned 18 years of age.  Joanne testified that she had similar concerns for Jennifer on two other occasions: once when her son's friend sent "inappropriate" e-mails to Jennifer; and another time when she reported to the police that a young man had tried to "force himself" on Jennifer.  Joanne also testified that when Jennifer had a boyfriend who was one year older than she was, Joanne felt there was nothing inappropriate about the two kissing and hugging one another.

Summer Knuth, 18 years old at the time of trial, testified that she met Downin through Jennifer whom she described as her best friend.  Knuth testified that in Jennifer's home there was a bed in the living room on which Jennifer's dad would usually sleep.  The bed was located about 5 to 10 feet from the fireplace with no obstructing walls in between.  Knuth stated Jennifer told her that she had sex with Downin in her parents' home by the fireplace and in her bedroom.  Knuth testified that she had observed Jennifer on the home's computer accessing both her own e-mail and e-mail accounts belonging to others, including Downin.  Knuth testified that Jennifer was able to access Downin's e-mail account because she possessed his password.  Knuth testified that on June 11, 2001, she had a conversation with Jennifer in Jennifer's home.  Knuth stated that Jennifer told her she was upset because Downin was pleading not guilty.  Jennifer mentioned a movie titled, "Crush."  According to Knuth, Jennifer explained that the movie was about a girl who plotted revenge against a man because she was jealous of another girl.  The character in the movie retrieved a condom the man had used and inserted it in her vagina.  Jennifer also told Knuth she had turned over to the police a calendar on which she had falsely stipulated days she and Downin had engaged in sex.

Eighteen-year old Ashley Giles testified she and Jennifer had worked together. In November of 2001, Giles had a conversation with Jennifer during which Jennifer advised Giles that if she was having problems with a man she could create trouble for him by falsifying e-mails.  According to Giles, Jennifer also summarized the movie "Crush" for Giles and told her that like the girl in "Crush," Jennifer had taken a used condom from Downin's home.  Giles later met and befriended Downin via the Internet.

Mary Downin, the mother of the defendant, testified.  Mary stated that on January 26, 2001, Downin did not have access to an automobile.  Mary testified that in March or April of 2001, Downin was seeing a girl named Raivan.  Mary stated that when she cleaned house during the year 2001, she found condom wrappers and condoms in the trash in Downin's room.  She acknowledged Downin was likely sexually active during the time.  Mary stated she was aware Downin knew Jennifer.  He never stated to Mary that he and Jennifer were sexually active.

Arthur Spires testified.  Spires first met Downin when Spires employed Downin in April of 1998 at Trilutions Computer and Internet Center.  Spires recalled that on January 23, 2001, Downin failed to show for a dinner at Spires’ home.  Spires stated he found out the next day that Downin was suffering from a sinus infection.  On January 25, 2001, Spires visited Downin at his home.  Spires described Downin as in "rough shape."  According to Spires, Downin spent the evening with him on February 4, 8, and 10, 2001.  Spires testified that he met Jennifer when Downin brought her to a company Christmas party.  Downin told Spires he and Jennifer were friends. Spires testified Downin vehemently denied having had any sexual relationship with Jennifer.

John Bo Ring of Trilutions Computer and Internet Center testified he had a bachelor's degree in computer science and had been receiving continuing specialized training in computer networking.  Ring testified that he was in charge of the Internet department at Trilutions, which handled 2,500 Internet clients on a daily basis, with an emphasis on e-mail accounts.  Ring was tendered as an expert in the field of electronic mail and computers.  Ring explained the mechanics of e-mail.  According to Ring, a printed copy of e-mail does not necessarily reflect the origination of the e-mail because printed copies of e-mail can be created from sources other than the e-mail program.  Ring testified that by using other computer programs it is possible to duplicate the look of e-mail communications.  Ring stated that the exhibit introduced as an e-mail response to Jennifer's e-mail appeared to have been sent from 
nicd@galesburg.net
 through the website "hotmail," run by Microsoft.  Ring stated the only way to authenticate the origination of the mail was through an investigation of the Internet provider (IP) address, an address not included on the exhibit provided.

At the close of the evidence and closing arguments, the trial court found Downin guilty of the allegations related to the dates January 27, 28, and 29, 2001.  Downin filed a motion for a new trial on July 11, 2003.  On July 24, 2003, the court sentenced Downin to a 60 day term of incarceration, a $1,000 fine, and a 30 month term of probation.  Downin appeals his conviction and sentence.      

ANALYSIS

Downin's first argument on appeal is that the statute under which he was charged with criminal sexual abuse, section 12-16(d) of the Code (720 ILCS 5/12-16(d) (West 2002)), unconstitutionally violates the fourteenth amendment equal protection clause (U.S. Const. amend. XIV), because it criminalizes sexual intimacy between individuals who could obtain a marriage license under the Illinois Marriage and Dissolution of Marriage Act (the Act) (750 ILCS 5/203 (West 2002)), and presumably engage in the same sexual conduct prohibited under section 12-16(d) of the Code.  Under section 12-16(d) of the Code, an individual commits an act of aggravated criminal sexual abuse if the person “commits an act of sexual penetration or sexual conduct with a victim who was at least 13 years of age but under 17 years of age and the accused was at least 5 years older than the victim." 720 ILCS 5/12-16(d) (West 2002).  Under section 203(1) of the Act, a person 16 years of age but not yet 18 years of age may obtain a marriage license if the person "has either the consent to the marriage of both parents or his guardian or judicial approval." 750 ILCS 5/203(1) (West 2002).  In the present case, at the time of the offense, Downin was 22 years of age and Jennifer was 16 years of age.  According to Downin, the aggravated criminal sexual abuse statute violates equal protection in that it restricts unmarried 16-year-olds and their paramours from engaging in sexual intercourse even with parental consent while 16-year-olds married with parental consent may presumably engage in sexual intercourse with their spouses.  A constitutional question is reviewed under a 
de novo 
standard. 
Miller v. Rosenberg
, 196 Ill. 2d 50, 57, 749 N.E.2d 946, 951 (2001).

Downin urges this court to apply a strict scrutiny analysis to this issue, arguing that the conduct in question falls under the penumbra of a "fundamental right to privacy."  In asserting his argument, Downin relies heavily on the case of 
Lawrence v. Texas
, 539 U.S. 558, 156 L. Ed. 2d 508, 123 S. Ct. 2472 (2003).  In 
Lawrence
, the United States Supreme Court applied the rational basis test and concluded that the statute at issue, which made it a crime for two persons of the same sex to engage in a consensual act of sodomy in the privacy of their home, was an unconstitutional violation of due process.  
Lawrence
, 539 U.S. at 579, 156 L. Ed.2d at 526, 23 S. Ct. at 2484.  Downin urges this court to extrapolate from the 
Lawrence
 decision the "inescapable" conclusion that 
Lawrence
 stands for the proposition that homosexual conduct falls within the penumbra of the fundamental right to privacy or liberty and the further implication that the right of nonmarried individuals to engage in sexual conduct is likewise a fundamental right.  Although a valiant attempt to stretch the boundaries of 
Lawrence
, Downin's argument is unpersuasive.  The Supreme Court in 
Lawrence
 stated that liberty gives substantial protection to adult persons in deciding how to conduct their private lives in matters pertaining to sex. 
Lawrence
, 539 U.S. at 572, 156 L. Ed. 2d at 521, 123 S .Ct. at 2480.  However, as Downin admits, the Court in 
Lawrenc
e did not conclude that sodomy or any other sexual activity is a fundamental right.  The 
Lawrence
 decision involved a due process claim and was resolved through an application of the rational basis test.  
Lawrence
, 539 U.S. at 578, 156 L. Ed.2d at 525,123 S. Ct. at 2484 (finding the Texas statute furthered no legitimate state interest which could justify its intrusion into the personal and private life of the individual).  Finally, and importantly with respect to the case at hand, the Supreme Court in 
Lawrence
 carefully crafted the opinion to apply only to the private consensual activity of
 
 
adults
, stating, “[t]he present case does not involve minors.” (Emphasis provided) 
Lawrence,
 539 U.S. at 578, 156  Ed. 2d at 525, 123 S. Ct. at 2484.  We thus determine the appropriate standard of review in the present case is the rational basis test. 
People v. Reed
, 148 Ill. 2d 1, 7-8, 591 N.E.2d 455, 457 (1992) (laws that do not impinge on fundamental constitutional rights are subject to rational basis review).

We turn now to the issue of
 whether the Code and the Act place similarly situated persons into different classes for reasons wholly unrelated to the purposes of the legislation. 
People v. Reed
, 148 Ill. 2d 1, 7, 591 N.E.2d 455, 457 (1992).  Equal protection requires that similarly situated individuals be treated under the law in a similar manner. 
Reed,
 148 Ill. 2d at 7, 591 N.E.2d at 457.  Downin asserts that under the Code, those persons who engage in sexual intercourse while unmarried who are of the same age as those persons who presumably engage in sexual intercourse after having married with parental consent under the Act are similarly situated, yet differently treated. 
 Under the rational basis standard, a statute needs to bear only a rational relation to a legitimate legislative purpose and be neither arbitrary nor discriminatory.  
People v.Williams
, 349 Ill. App. 3d 273, 274, 811 N.E.2d 1197, 1198 (2004).  If any state of facts may be reasonably conceived to justify the legislation, it must be upheld. 
Reed
, 148 Ill. 2d at 8, 591 N.E.2d at 458. Whether a statutory classification is justified requires an examination of its purpose.  
Reed
, 148 Ill. 2d at 9, 591 N.E.2d at 458.   As stated in 
Reed
, the purpose of section 12-16(d) of the Code is to protect children from sexual exploitation by adults five or more years older than themselves. 
Reed
, 148 Ill. 2d at 10, 591 N.E.2d at 459.  The aggravated criminal sexual abuse statute bears a rational relationship to this objective. 
Reed
, 148 Ill. 2d at 10, 591 N.E.2d at 459. 

  Section 12-16(d) of the Code recognizes that age disparity increases the likelihood that a minor will succumb to the sexual overtures of an adult. 
Reed
, 148 Ill. 2d at 10, 591 N.E.2d at 459.   Section 203(1) of the Act recognizes that when a 16-year-old has parental approval to marry, the likelihood that the minor is being exploited by an adult is greatly diminished.  The involvement of the parents or someone acting
 in loco parentis
 assumes that the ability of the 16-year-old to confront the consequences of premature sexual experience has been addressed by an older party with the young person's interest in mind.  This protection, combined with a State-sanctioned marriage, which mandates that the parties bear some responsibility for one another, mitigates the opportunity for overreaching on the part of an adult 21-years or older seeking a relationship with a 16-year-old. It follows that the legislature could conclude that section 203(1) of the Act is a reasonable means to address the objective of section 12-16(d) of the Code, the prevention of sexually exploitive encounters between minors and adults with significant age differences, by requiring the involvement of an adult interested in the minor's welfare and a State-sanctioned marriage.  For these reasons, persons who marry under the Act are not similarly situated to persons of the same age who in violation of the Code engage in sexual intercourse while unmarried.  The classifications of the statutes are not wholly unrelated in purpose or arbitrary and therefore do not violate equal protection.

Downin's next argument on appeal is that he was not proven guilty beyond a reasonable doubt. 
Downin argues that because the trial court concluded he was not guilty of the counts of aggravated criminal sexual abuse for which he presented alibi evidence, the court should have had a reasonable doubt as to all of the dates Jennifer alleged they engaged in sexual intercourse.  Downin also asserts that Jennifers' testimony was so incredible as to be contrary to human nature or experience.  Specifically, Downin asserts as incredible Jennifer's testimony that some of her sexual encounters with Downin took place in front of the fireplace within feet of where her father lay sleeping.  Also according to Downin, in light of testimony that Jennifer related the plot of the movie "Crush" to two of the witnesses and indicated to one that she had taken a used condom from Downin's trash, Jennifer's assertion that semen from Downin was on her underwear because they had sexual intercourse was an obvious fabrication.  Downin further questions the validity of the e-mail introduced as evidence, an argument that will be addressed below. 
 
Whether a defendant was found guilty beyond a reasonable doubt is a question reviewed in a light most favorable to the prosecution using the standard of whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. 
People v.Collins
, 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277 (1985).  Findings based on the credibility of the witnesses and the weight given their testimony are determinations exclusively within the province of the finder of fact.  See 
Collins
, 106 Ill. 2d at 261-62, 478 N.E.2d at 277.  When evidence is merely conflicting, a reviewing court will not substitute its judgment for the judgment of the trier of fact.  
People v. Miller
, 222 Ill. App. 3d 1081, 1086, 534 N.E.2d 551, 555 (1991).  In the present case, with the exception of the issue of the propriety of the introduction of the e-mail copies into evidence, the disputes that Downin notes are determinations of credibility and weight that are exclusively within the province of the finder of fact, in this case, the trial court.  Jennifer testified she had sexual intercourse with Downin after their feelings changed for each other.  Jennifer's mother indicated she was sensitive to the possibility that Downin might view his relationship with Jennifer as sexual.  She testified that she noted a change in the nature of the relationship around the time that Jennifer's cat died.  Jennifer also used this event as a point of reference.  Although the testimony of Jennifer's friend, Knuth, conflicted with Jennifer's in many respects, Knuth testified that Jennifer told her she had sexual intercourse with Downin in her home by the fireplace and in her bedroom.  Jennifer testified that her father's bed was located on the far wall away from the fireplace of a fairly large room.  She stated that when he fell asleep he was "out." Jennifer testified a bathroom separated her mother's bedroom from hers. When Jennifer was in her bedroom she kept the door closed.  The DNA evidence supported Jennifer's testimony as did the printed e-mail communications.  For these reasons, viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

Downin's final argument on appeal is that the trial court erred in admitting into evidence two printed versions of e-mail purportedly sent by Downin to Jennifer. The e-mail contained admissions of guilt.  Downin asserts that because the documents were not properly authenticated, the copies were inadmissible for lack of a proper foundation. Downin argues that in the absence of any evidence of an Internet provider address linking the e-mail to Downin, there is no way to tell that the e-mail copy was not falsified by Jennifer.
 
 A trial court's decision to admit a document is reviewed under an abuse of discretion standard. 
People v. Ross
, 329 Ill. App. 3d 872, 884, 769 N.E.2d 953, 965 (2002). A finding of authentication is merely a finding that there is sufficient evidence to justify presentation of the offered evidence to the trier of fact and does not preclude the opponent from contesting the genuineness of the writing after the basic authentication requirements are satisfied.  
People v. Munoz
, 70 Ill. App. 3d 76, 86, 388 N.E.2d 133, 140 (1979), citing P. Broun, 
Authentication and Contents of Writings
, 1969 Ariz. St. L. J. 611, 624-34.  The prosecution need only prove a rational basis upon which the fact finder may conclude that the exhibit did in fact belong to the defendant. 
Munoz
, 70 Ill. App. 3d at 88, 388 N.E.2d at 141.  The ultimate issue of authorship is for the trier of fact to determine. 
Munoz
, 70 Ill. Ap. 3d at 88, 388 N.E.2d at 142.  

A document may be authenticated by direct or circumstantial evidence. 
People v. Towns
, 157 Ill. 2d 90, 104, 623 N.E.2d 269, 275 (1993).  Circumstantial evidence of authenticity includes such factors as appearance, contents, and substance. 
Towns
, 157 Ill. 2d at 104, 623 N.E.2d at 275.  
Prima facie
 authorship of a document may include a showing that the writing contains knowledge of a matter sufficiently obscure so as to be known to only a small group of individuals. See 
Munoz
, 70 Ill. App. 3d at 87-88, 388 N.E.2d at 141.  These factors that courts use in authenticating writings and other items similarly apply to e-mail messages. M. Robins, 
Evidence at the Electronic Frontier: Introducing E-Mail At Trial in Commercial litigation
, 29:2 Rutgers Computer & Tech. L. 219, 228 (2003).  “ [C]ourts are unlikely to deviate from the basic approach of the Federal Rules of Evidence towards authenticating e-mails *** merely because of the different medium used to generate such evidence ***. [I]t appears that courts have found the framework of these rules sufficient to address questions presented by e-mail.”  29:2  Rutgers Computer & Tech. L. J. at 238.

In the present case, although Downin argues the characteristics of e-mails preclude the application of standards used to authenticate reply letters, the similarities between the two offer guidance in determining the authenticity of the e-mail copies.  Jennifer testified she met Downin over the Internet.  Before and after they met in person they communicated via e-mail.  When Deputy Caslin suggested Jennifer send an e-mail to Downin from the public safety building, she used the e-mail address for him that she had used on all prior occasions.  Jennifer testified she received a reply from Downin's e-mail address at her e-mail address, the same address Downin had previously used to communicate with her.  The reply e-mail was responsive to the e-mail Jennifer sent and she testified it contained information known exclusively to her and Downin.  For these reasons the trial court did not abuse its discretion in admitting the e-mail copies into evidence.  Thereafter, Downin was free to, and did, challenge the genuineness of the documents. It was for the trier of fact to make the ultimate determination of authorship.

For the foregoing reasons, the judgment of the circuit court of Knox County is affirmed.

Affirmed.

BARRY and McDADE, JJ., concurring.