THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALBERT LEE MILLER, Defendant-Appellant.

Third District No. 3—90—0638

Opinion filed December 30, 1991.

Timothy M. Gabrielsen, of State Appellate Defender's Office, of Springfield, for appellant.

Samuel Naylor VI, State's Attorney, of Carthage (Terry A. Mertel and John X. Breslin, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GORMAN delivered the opinion of the court:

The trial court convicted the defendant, Albert Lee Miller, of three counts of aggravated criminal sexual abuse (Ill. Rev. Stat. 1989, ch. 38, par. 12—16(b)). It subsequently sentenced him to 30 months' probation, conditioned upon his serving 90 days in the county jail and paying a $200 fine. The defendant appeals his conviction. We affirm.

The record shows that the defendant was convicted of one count of aggravated criminal sexual abuse of his granddaughter A.R. This count alleged that on or about April 12, 1989, the defendant, a family member, knowingly committed an act of sexual conduct by fondling or touching A.R. through her clothing on her vagina, when she was under the age of 18 years. The defendant was also convicted of two counts of aggravated criminal sexual abuse of his granddaughter C.R. One count alleged that on or about April 12 to April 26, 1989, a Wednesday, the defendant, a family member, knowingly committed an act of sexual conduct by touching or fondling C.R. on her breast when she was under the age of 18 years. The other count alleged that within the same time frame the defendant had touched or fondled C.R. through her clothing on her vagina. The trial court directed verdicts for the defendant on four other counts of sexual abuse involving the defendant's two other grandchildren, B.R. and M.R.

At trial, nine-year-old A.R. testified that her family moved into her grandparents' home on April 9, 1989. Approximately three days later, as A.R. walked by the defendant in the kitchen, he pulled her onto his lap and touched her through her clothes in her crotch area.

The defendant used his hand that was not crippled. Her grandmother was in the kitchen at the time, first reading a book and then fixing supper.

A.R.'s testimony on direct examination concerning the whereabouts of her brother and sisters at the time of the incident in question was unclear. However, on cross-examination she stated that her brother and sisters were outside and she was going to join them when the defendant pulled her onto his lap and began touching her. When the other children became tired of playing outside and came back into the house, the defendant stopped his actions. The other children then went into the living room.

Eleven-year-old C.R. testified that one incident of sexual abuse occurred in the defendant's bedroom a couple of days after she and her family moved into the defendant's home. The defendant had said he was tired, and C.R. and her brother B.R. helped the defendant into his bedroom. C.R. testified that the defendant pulled them onto the bed and started touching them. She admitted that she did not actually see the defendant touch B.R. She stated that at one point she tried to crawl over the foot of the bed but was pulled back by the defendant. On direct examination, she stated that there was a wooden board at the foot of the bed, but on cross-examination she admitted that she had been mistaken and there was no wooden board. After pulling her back on the bed, the defendant rubbed her under her dress on her chest with his hand that was not crippled. The defendant held her on the bed by wrapping his legs around one of hers.

C.R. further testified that she was not sure but she thought her stepfather, Ronnie, was at home in his room that day. This incident ended when her sister, M.R., came into the bedroom three or four times to tell them to come to supper. While in the bedroom, the defendant told C.R. not to tell anyone about what had occurred. C.R. testified that the defendant told her not to tell her mother "or else" on a subsequent occasion in the living room.

C.R. also testified to other incidents of sexual abuse which took place in the defendant's kitchen. She testified that one of the occasions of abusive touching occurred while "My Two Dads" was on television, which aired on Wednesday evenings. During one instance, C.R.'s grandmother and either her sister A.R. or her brother B.R. were present. Her grandmother was standing by the stove making supper. C.R. testified that the defendant touched her under her shirt and on her "privates" between her legs. C.R. noted that she and A.R. were screaming and her grandmother told them to stop. According to C.R., she and her siblings sometimes yelled in the defendant's home.

Her grandmother would sometimes ignore them or tell them to be quiet without looking at them. C.R. testified that this type of touching by the defendant happened on more than one occasion on different days and her grandmother was not always present.

Sheriff's deputy John Jefferson testified that he interviewed C.R. on June 26, 1989. C.R. told him about two separate touching incidents, one in the defendant's kitchen and one in his bedroom. C.R. also told him that the defendant had only warned her once in the bedroom not to tell anyone.

Terri Allen, a Department of Children and Family Services (DCFS) investigator, interviewed the children on June 29, 1989. She testified that the children were upset and shy during the interview. C.R. told Allen that the defendant had grabbed her and B.R., taken them into the bedroom, and put them on the bed. C.R. also told Allen that the defendant had only warned her once in the bedroom not to tell.

Thirteen-year-old M.R. testified that she and her family moved in with the defendant on Sunday, April 9, 1989. A few days later, she saw C.R. and B.R. walk the defendant to his bedroom. A.R. followed them in. Subsequently, M.R. returned several times to call the children and the defendant to supper. The first time, A.R. left the room. The next time, M.R. saw the defendant's hand down B.R.'s pants. After that, B.R. left and C.R. remained. Finally, she returned and saw the defendant with his good hand up C.R.'s shirt. C.R. told M.R. she could not come to eat because the defendant kept pulling her down on the bed. M.R. further testified that she and the other children did not say anything because C.R. told them the defendant had told her not to tell anyone. M.R. stated that the children began telling others a few days after they moved out of the defendant's home.

Ronnie Noll, the children's stepfather, testified that he and his family moved in with the defendant around April 6, 1989, and stayed with him for about three weeks. A few days after they moved out of the defendant's home, C.R. told him the defendant had been touching all of the children and that she was afraid to tell anyone because the defendant had threatened her.

Carolyn Hameedah Carr, a sexual assault therapist, testified that she interviewed the children in December of 1989. In her opinion, the symptoms of C.R., M.R., and A.R. were consistent with sexual abuse.

The defendant testified that he had been unable to use his right hand since an accident which occurred 20 years prior to the date of trial. He denied any sexual misconduct toward the children. He stated that he had wrestled with B.R. and C.R. on his bed the first Saturday

after they moved in, but denied any improper touching. The defendant also testified that he and Ronnie Noll worked for the defendant's brother, Gene. He claimed that he and Noll would return home after work between 8 and 9 p.m. on weekdays. The trip home took about 45 minutes.

Donna Noll, the victims' mother and the defendant's daughter, testified along with Ronnie Noll that the defendant and Ronnie did not work that late. Ronnie stated that they returned from work anywhere from 4 to 8 p.m., depending upon the job. Donna stated that the defendant and Ronnie returned from work between 6 and 8 p.m. Both Donna and Ronnie testified that on several days in April the defendant and Ronnie did not work because of rain. Ronnie also testified that he and Donna had gone to Hannibal, Missouri, on the first Saturday after he and his family moved in with the defendant.

Barbara Miller, the defendant's sister-in-law, testified that the defendant and Noll worked for her husband and they usually worked until 7 to 8:30 p.m. They would leave her house around 8 p.m. or sometimes 9 p.m.

Donna Noll testified that the defendant had touched her in inappropriate ways from the time she was 11 years old until she was 14 and left home for foster care. She also testified that after moving back in with the defendant she was upset with him for various things, such as his not allowing her and her then-boyfriend Ronnie to shower together and for not fulfilling his promise to replace the furniture she sold before moving home with the defendant. She also admitted that she was upset with the defendant for telling her not to return to the house again. She denied having said that she would get even with the defendant.

Barbara Walker, another of the defendant's daughters, testified that Donna told her she would "make [her father] pay." Walker further stated that she never witnessed any improper touching of Donna's children by the defendant. She stated that because she had three sexually abused stepchildren she knew the symptoms they would manifest. She never saw Donna's children manifest those symptoms.

Jean Miller, the defendant's wife, testified that she saw Donna's children on the defendant's lap constantly during their stay. According to her, there was no way the defendant could have engaged in the alleged misconduct in the kitchen area without her knowing about it. She would not have tolerated it.

Steve Blentlinger, the defendant's stepson, testified that he saw Donna's children playing with the defendant on the Sunday following the Saturday that Ronnie and Donna went to Hannibal. He never saw

the children exhibit any fear of the defendant, nor did he see the defendant engage in any sexual misconduct with them. Percy Blentlinger, the defendant's father-in-law, also saw the children that Sunday. He did not see the defendant exhibit any improper conduct toward them.

On appeal, the defendant argues he was not proven guilty beyond a reasonable doubt. He asserts that the evidence was insufficient to establish the aggravated criminal sexual abuse of either C.R. or A.R.

■■ Initially, we note that the defendant has not cited the correct standard of review in the instant case. In *People v. Schott* (1991), 145 Ill. 2d 188, the Illinois Supreme Court clarified the law regarding the standard of review in sex-offense cases. In order to sustain a conviction, the evidence need no longer meet the standard that either the complainant's testimony was clear and convincing or was substantially corroborated. Instead, the ordinary standard in criminal cases applies, *i.e.*, whether, after viewing all of the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.) When evidence is merely conflicting, a court of review will not substitute its judgment for that of the trier of fact. (*People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733.) Minor discrepancies in a child's testimony do not necessarily render the testimony incompetent, unbelievable, or impeached. (*People v. Brewer* (1983), 118 Ill. App. 3d 189, 454 N.E.2d 1023.) In reviewing a claim by the defendant that a sexual assault victim's testimony is implausible, a reviewing court must remember that the trier of fact believed the witness and that the fact finder's finding of guilt will not lightly be disturbed. *People v. Davis* (1981), 95 Ill. App. 3d 161, 419 N.E.2d 682.

In the instant case, the defendant argues that it was unclear from the testimony whether the improper touching of C.R. occurred in the kitchen or bedroom. We find that C.R.'s testimony in the record is clear that the improper touching took place in both rooms.

The defendant also contends that the State was required to prove a specific date on which the offenses against both A.R. and C.R. occurred. Since an exact date was not proven, the defendant contends the State failed to prove him guilty. Initially, we note that the charging instruments did not allege specific dates upon which the offenses occurred, but rather gave a general time frame. Therefore, the exact date of the offenses was not an element of the crimes charged, and the proof of an exact date was not required. (See *People v. Kelly* (1989), 185 Ill. App. 3d 43, 540 N.E.2d 1125.) Additionally, a witness'

inability to remember the exact dates of an offense merely affects the weight to be given his testimony and does not create a reasonable doubt of guilt. *People v. Foley* (1990), 206 Ill. App. 3d 709, 565 N.E.2d 39.

The defendant argues that the victims' and M.R.'s testimony established that the offenses occurred on a weeknight. He also asserts that his testimony, Ronnie Noll's testimony, and the testimony of other witnesses established that he would not yet have returned home from work at suppertime, when the alleged offenses occurred.

We find from a careful reading of the record that the children's testimony did not preclude the possibility that the offenses could have taken place on a Saturday when the defendant was home. Indeed, the defendant admitted wrestling with C.R. and B.R. in his bedroom on a Saturday. He only denied any improper touching. Further, even if the offenses occurred on a weeknight, the trial judge was not required to accept the defendant's assertions that he could not have been home. Additionally, Ronnie Noll's testimony did not support the defendant's testimony, but rather established that on some nights the defendant was home as early as 4 p.m. and that they did not even go to work on several days in April due to rain. The trial judge was not required to accept the defendant's version of events, and there was sufficient evidence from which the judge could have concluded that the defendant was present to commit the offenses.

The defendant also argues that C.R.'s testimony concerning the incident in the bedroom was impossible or improbable since the defendant had a useless hand and could not possibly have held both C.R. and B.R. on the bed and molested them. We note from the record that C.R. did not testify that B.R. was held down on the bed by the defendant at the same time that he held her down. C.R. testified that the defendant had his leg wrapped around hers. She also stated that he touched her with his good hand. We further note that M.R.'s testimony corroborated C.R.'s concerning the bedroom incident. In short, we find nothing in the record that makes C.R.'s account of the bedroom incident impossible or improbable.

The defendant also argues that C.R. was impeached by her testimony that she thought Ronnie Noll was present in his bedroom in the defendant's home when the bedroom incident occurred. He also asserts that she was impeached when she first stated that there was a wooden board at the foot of the bed and then later admitted there was not.

Again, a careful reading of C.R.'s testimony reveals that she only stated that she thought Ronnie was home, but was not sure. Also, she

stated on cross-examination that she had been mistaken regarding the wooden board at the foot of the bed. We do not find these discrepancies so important that they cast serious doubt on C.R.'s testimony as a whole.

The defendant also attacks the trial judge's finding that most of the acts in the kitchen that C.R. complained about took place below the table and would thus have been out of the view of the defendant's wife. The defendant asserts that this conclusion was erroneous since no testimony concerning where the defendant sat, or of Mrs. Miller's view, was adduced at trial.

We note from the record that the defense introduced pictures at trial which depicted the defendant seated at the kitchen table. Also, testimony regarding where the defendant generally sat was introduced. Finally, pursuant to a defense request, the trial judge visited the defendant's residence and was able to personally view the table where the defendant sat from Mrs. Miller's vantage point. Thus, we find that the trial judge had ample evidence upon which to base his conclusion.

The defendant also complains that since the trial court concluded that the incidents in the kitchen took place outside the clothing, the State failed to prove the count which charged that the defendant touched C.R.'s breast under her shirt. However, we note simply that there was ample evidence presented which established that this improper touching took place in the bedroom. Therefore, this portion of the defendant's argument is also without merit.

The defendant further argues that A.R.'s testimony was inconsistent concerning where her siblings were when the defendant fondled her in the kitchen. A careful reading of her testimony reveals that she was fairly clear about their whereabouts, as the factual recitation above indicates.

Finally, the defendant notes that several witnesses testified that they never saw the children exhibit any signs of fear of the defendant, nor did they witness any improper touching. Again, he argues this testimony was inconsistent with a finding of sexual abuse.

Regarding this argument, we simply note that there was also ample evidence presented which indicated that the children's behavior was consistent with sexual abuse. The defendant had warned C.R. not to tell anyone. C.R. told the other children of the warning. The children complained of the abuse shortly after moving away from the defendant. Additionally, Ms. Carr, the sexual abuse therapist, testified that the children's behavior was consistent with sexual abuse. The trial judge was in the best position to judge the credibility of the wit-

nesses and their possible bias in testifying. We cannot say he should have placed more weight on the testimony of the witnesses for the defendant.

■ In conclusion, we note that the trial judge heard all of the testimony presented at trial. Thus, he was aware of all of the alleged inconsistencies the defendant now complains about on appeal. Before finding the defendant guilty, the trial judge specifically noted that the girls' testimony was corroborated by their prompt complaints and stated that he believed they were telling the truth about the essential facts. Based on our review of the record, we cannot say the trial judge erred in his conclusions. Applying the *Schott* standard, we find that the defendant was proved guilty beyond a reasonable doubt. *People v. Schott* (1991), 145 Ill. 2d 188.

The judgment of the circuit court of Hancock County is affirmed.

Affirmed.

STOUDER, P.J., and BARRY, J., concur.