NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 190140-U

NO. 4-19-0140

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 28, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Adams County |
| BOBBY A. HILL, | ) | No. 18CF790 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Mark A. Drummond, |
| | ) | Judge Presiding. |

JUSTICE HOLDER WHITE delivered the judgment of the court.
Justices Harris and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, concluding (1) trial counsel was not ineffective for
failing to object to the admission of photographs of the victim with captions and
emojis where the State properly authenticated the photographs and (2) the trial
court did not err in imposing an aggregate 38-year sentence.

¶ 2    Following a January 2019 trial, a jury found defendant, Bobby A. Hill, guilty of

two counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2016)) and two counts of

child pornography (photographing) (720 ILCS 5/11-20.1(a)(1)(vii) (West 2016)).  In February

2019, the trial court imposed 13-year sentences for each count of criminal sexual assault and

6-year sentences for each count of child pornography (photographing), all to run consecutively,

for an aggregate sentence of 38 years' imprisonment.

¶ 3    Defendant appeals, arguing (1) he received ineffective assistance of trial counsel

for failing to object to the admission of photographs of the victim that contained captions and

emoticons (emojis) where the State failed to lay an adequate foundation to establish defendant created the photographs and (2) the trial court erred by imposing 13-year sentences for both counts of criminal sexual assault where mitigation factors supported a lesser sentence, and his aggregate sentence of 38 years' imprisonment was excessive. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5            On December 6, 2018, the State filed an amended bill of indictment, charging defendant with (1) two counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2016)), (2) two counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(d) (West 2016)), (3) two counts of child pornography (photographing) (720 ILCS 5/11-20.1(a)(1)(vii) (West 2016)), and (4) two counts of child pornography (possession) (720 ILCS 5/11-20.1(a)(6) (West 2016)).

¶ 6                            A. Pretrial Motion to Exclude

¶ 7            On December 7, 2018, defendant filed a motion to exclude, seeking to bar "explicit photographs [that] cannot be positively identified as the alleged victim in this matter and even if it could be, it does not prove directly or substantially the crimes as alleged and does nothing more than prejudice the [d]efendant and inflame the passion of the jury."

¶ 8            At a January 4, 2019, hearing on the motion to exclude, defense counsel informed the trial court that she and the State reached an agreement with respect to the motion. Specifically, defense counsel stated,

                "Generally, the People would agree to not introduce any

                photographs that have not been or cannot be positively identified

                as that of the victim. [The assistant state's attorney] was kind

                enough to bring copies of the photographs that she intends to use at

- 2 -

trial, I have reviewed those photo[graphs] and they do appear to be photo[graphs] that, at one point in time, were identified by the alleged victim in this matter. So, as far as the motion to exclude, we have an agreement with respect to that and what will come in and what will not come in."

The trial court accepted the parties' agreement and acknowledged defendant reserved the right to object to the foundation for admission of those photographs.

¶ 9                           B. Defendant's Jury Trial

¶ 10        Below, we summarize the relevant testimony elicited during defendant's January 2019 jury trial. Before the State called its first witness, it dismissed four counts in the amended bill of indictment. The case proceeded to trial on two counts of criminal sexual assault (counts I and II) and two counts of child pornography (photographing) (counts III and IV).

¶ 11                              1. *I.G.*

¶ 12        I.G., the victim, testified that in June 2018 she was 15 years old and lived in Quincy, Illinois, with her father, Ricky G., stepmother, Tiffany Douglas, biological siblings, and stepsiblings. I.G. shared a bedroom with her stepsister, D.N. I.G. referred to Douglas as her stepmother even though Ricky G. and Douglas were not married.

¶ 13        In the summer of 2018, defendant, a friend of I.G.'s father, regularly visited her father at their house where her father and defendant would sit outside, socialize, and drink. I.G. testified defendant came over to her house on Tuesdays and Thursdays because her stepmother worked in the evening on those days. I.G. identified defendant in court.

¶ 14        On several occasions in June or July 2018, defendant and I.G. were alone in the house, and defendant made comments to I.G. about her body. I.G. testified that in the middle of

August 2018, she and defendant were alone in the kitchen and he asked her "to suck his dick."

In response, I.G. walked away. Defendant told her to come back, so she did. I.G. testified

defendant then "pulled down his pants and asked me to suck his dick." When defendant pulled

his pants down, he exposed his penis. I.G. testified she told him "no" but he put his hand on the

back of her head and pushed her head toward his penis. Defendant then placed his penis in I.G.'s

mouth. I.G. testified defendant made a noise "[k]ind of like a moan." Defendant then ejaculated

into I.G.'s mouth. I.G. testified she "didn't know where to spit so I kind of swallowed—yeah, I

swallowed it." I.G. then went upstairs to her bedroom and did not come back downstairs for the

rest of the night. When the incident occurred, I.G. did not tell anyone about the incident.

¶ 15 A few weeks later, defendant and I.G. were alone in the house. I.G. began to

walk out of the bathroom, and defendant stood in the doorway of the bathroom. Defendant held

out his cellular telephone to I.G. and asked her to take photographs of her buttocks. I.G. testified

defendant took photographs of her buttocks while she was wearing gray, "boy short boxer-type

of underwear." Then defendant asked I.G. to pull her pants down to take photographs of her

buttocks without underwear. I.G. stated, "I don't know if, like, someone came in the house or

not, but he shut the door and he handed me the [tele]phone and he told me to take a photograph

of my butt[ocks]." I.G. testified "[h]e took [photographs] of my butt[ocks] with underwear, and

then there was [photographs] of my butt[ocks] without underwear."

¶ 16 I.G. identified herself in People's Exhibit Group 7, which consisted of several

photographs of I.G.'s buttocks with underwear and without underwear. I.G. identified People's

Exhibits 7A and 7B as photographs of her buttocks without underwear. I.G. recognized the

photographs "[b]ecause it's my bathroom, my shirt, and I have a scar on my hip." I.G. identified

People's Exhibits 7C, 7D, 7E, and 7F as photographs of her buttocks while she was wearing

grey, boy short boxer-type underwear. I.G. testified that when defendant took the photographs of her, he stood in the doorway of the bathroom. Defendant took a couple of the photographs, and defendant directed I.G. to take some of the photographs.

¶ 17 I.G. identified People's Exhibit 7G as a photograph of her buttocks while she was wearing grey, boy short boxer-type underwear, and the photograph included the words, "[I.G.] bubble booty." I.G. testified she did not put the words on the photograph and noted her name was spelled wrong. I.G. identified People's Exhibit 7H as a photograph of her buttocks when she was wearing grey, boy short boxer-type underwear. The photograph had "a couple of smiley faces on it." I.G. testified she did not put the smiley faces on the photograph. Specifically, I.G. stated, "I've never seen those, no." I.G. identified People's Exhibit 7I as a photograph of her buttocks while she was wearing grey, boy short boxer-type underwear, and the photograph contained the words, "bubble booty [I.G.]." I.G. again testified she did not know the words had been put on the photograph. Defense counsel did not object to the State's use of People's Exhibit Group 7.

¶ 18 After the photograph-taking incident, defendant and I.G. were alone in the house again. I.G. was getting ice for her father when defendant blocked the doorway and asked if she wanted to "suck his dick again." I.G. testified, "I said, no, and I went to walk away, and I told him I needed to take the glass of ice outside, and I took it outside, and after I came back in, he told me to come here and I would go walk up the stairs and he would tell me to come here again." I.G. went back to the kitchen where defendant pulled his pants down. Defendant put his hands down the back of I.G.'s pants and rubbed her buttocks. Defendant then pushed I.G.'s head toward his penis. I.G. testified she told defendant she did not want to do that and she went to yank her head back but he pushed her head forward. Defendant then put his penis in I.G.'s

mouth.  I.G. testified the incident did not take as long as the first time.  I.G. thought "he might have heard someone come in or seen someone because he backed up and then he went back outside and I just went to my room, and I waited for my sister, but they were outside, so."

¶ 19    I.G. testified that, "a little bit after the [photographs] were taken, [defendant] came over again and he asked me to babysit, and I didn't want to babysit, because it made no sense for me to come babysit if he was already going to be home, and after a little—like, he told my dad I was supposed to come babysit, and I didn't want to babysit over there, and a little bit after that, I told my sister [D.N.]."  Specifically, I.G. testified it was in September 2018 when she told her sister "everything that had happened" with defendant.

¶ 20    I.G. testified that a few days later,

> "[Her father] was outside in his car, and he told me to come
> outside, and I asked him what he wanted and he said, [defendant]
> said he gave you $20 to babysit and I understand you don't want to
> babysit, and I said, [defendant's] never given me $20 to babysit,
> and he was like, well, then why is he saying he did?  And, he said,
> I feel like there's something going on with you guys.  And, he
> asked what's going on, and I told him everything that happened,
> and, like, a little bit after that, I went in the house and he called me
> back outside and we drove over to [defendant's] house."

¶ 21    I.G.'s father demanded I.G. go with him over to defendant's house to talk about what was going on.  I.G. testified she was crying and upset.  I.G. did not want to go over to defendant's house, but her father told her to get in the car and they drove to defendant's house.

Once at defendant's house, I.G. refused to get out of the car. I.G.'s father and defendant talked, and then I.G.'s father got back in the car and they drove home.

¶ 22 The next day, I.G. and her stepmother were in the kitchen talking when defendant walked into the house. Defendant asked I.G.'s father to come outside. I.G.'s stepmother and father went outside to speak with defendant who was there with his girlfriend, Sadie Foust, and their baby. Eventually, I.G.'s stepmother and father asked I.G. to come outside. I.G. testified she went outside and "told them about what [defendant] made me do, about the [photographs], and how he asked me to babysit and the reason why I didn't want to babysit." Subsequently, I.G.'s stepmother took I.G. to the police station to file a police report.

¶ 23 On cross-examination, defense counsel questioned I.G. about the photographs in People's Exhibit Group 7. Specifically, defense counsel asked which photographs I.G took. I.G. testified she did not take People's Exhibit 7A but she took People's Exhibits 7B through 7I. However, when defense counsel reiterated I.G. took People's Exhibits 7B and 7C, I.G. testified she did not take People's Exhibits 7A or 7B. Specially, I.G. did not take the two photographs where she did not have on underwear.

¶ 24 On redirect examination, the State asked I.G. if she took the photographs in People's Exhibits 7A and 7B. I.G. testified she did not take the photographs in People's Exhibits 7A and 7B.

¶ 25                                          2. *Ricky G.*

¶ 26 Ricky G., I.G.'s father, testified that in September 2018, I.G. told him about the incidents with defendant and the photographs. Ricky G. explained he initially was "mad and angry" she did not tell him about the incidents sooner but I.G. said she was afraid to tell him because defendant was his best friend and she was afraid he would not believe her. After I.G.

told him about the incidents with defendant, Ricky G. text messaged defendant and defendant asked him to come over to his house to talk to him. Ricky G. acknowledged he should never have taken I.G. over to defendant's house to discuss what happened between the two of them. Once at defendant's house, I.G. never got out of the car. Defendant accused I.G. of lying, but she insisted she was not lying.

¶ 27 The next day, defendant came over to Ricky G.'s house with Foust and their newborn baby. Ricky G. and Douglas went outside to talk with defendant. Once outside, Ricky G. reiterated what I.G. told him happened with defendant. Ricky G. stated I.G. described to him what defendant's penis looked like. Eventually, I.G. went outside and again described what happened with defendant. I.G. said defendant would not let her out of the kitchen or bathroom when the events happened. Defendant denied the allegations.

¶ 28 Ricky G. testified when he looked back on the summer of 2018, there were many opportunities for defendant and I.G. to be alone in the house. A couple of weeks before I.G. told him about the incidents with defendant, Ricky G. remembered he went into the house because defendant had not come out of the house and he thought he saw a shadow of defendant making a hand motion to someone asking for oral sex. Ricky G. observed I.G. sitting on the stairs and defendant on his cellular telephone, so he did not think much of it. Ricky G. testified that in July, August, and September 2018, I.G. was not her usual self and spent a lot of time in her bedroom.

¶ 29 3. *Tiffany Douglas*

¶ 30 Tiffany Douglas, I.G.'s stepmother, testified that in June or July 2018, on more than one occasion, she observed defendant and I.G. alone in the house. At the beginning of June 2018, Douglas walked out of the bathroom and observed defendant say something up the stairs to

I.G. Douglas asked defendant what he said, but defendant told her he was just rapping and singing.

¶ 31    Douglas testified that after the incident, defendant generally came over to the house on Tuesdays and Thursdays while she was at work. Douglas testified that in the summer of 2018, I.G.'s demeanor changed toward defendant. Douglas recalled I.G. being excited for a family trip planned for June but when I.G. found out defendant was also going on the trip she did not want to go anymore.

¶ 32    On the night of September 20, 2018, Ricky G. called Douglas at work and told her what I.G. told him about the incidents with defendant. The next morning, defendant came over to the house with Foust. Douglas and Ricky G. went outside to speak with defendant. Ricky G. told defendant what I.G. told him happened between her and defendant. Defendant denied the allegations. Then, Ricky G. called I.G. outside and she reiterated the story and that she was not lying. Douglas told I.G. to go back inside because she was mad that defendant was trying to confront her. After I.G. went back in the house, Ricky G. told defendant that I.G. described his penis. When Ricky G. reiterated the description of defendant's penis to defendant and Foust, Foust said to defendant, "[S]he just described your dick to a T." Eventually, Douglas took I.G. to make a police report about the incidents with defendant.

¶ 33    4. *D.N.*

¶ 34    D.N., I.G.'s stepsister, testified she and I.G. had lived together their whole life and they shared a bedroom. In September 2018, D.N. discovered I.G. in their bedroom crying. D.N. asked I.G. what was wrong, and I.G. told her what had happened with defendant. D.N. told I.G. she needed to tell someone or she was going to. After I.G. disclosed to D.N. what happened

with defendant, D.N. followed I.G. around and stayed by I.G.'s side when defendant came over to the house.

¶ 35                    5. *Detective Kim Morrison*

¶ 36          Kim Morrison, a juvenile investigator with the Quincy Police Department, testified that on September 28, 2018, she observed an interview of I.G. at the Child Advocacy Center in Quincy. In October 2018, after police arrested defendant, Detective Morrison met with defendant and requested he turn over his cellular telephone. Defendant consented to police examining his cellular telephone. Specifically, defendant signed a consent form for police to search his "Samsung Galaxy Edge [cellular telephone] with a blue case." Detective Morrison sent a laboratory request to examine the cellular telephone for "[p]hoto[graphs] of [I.G.], a 15-year-old black female, on the [tele]phone specifically of her butt[ocks] with and without clothes on and the photographs would probably be taken in a bathroom." Detective Morrison then turned the cellular telephone over to the examiner, Detective Nick Eddy.

¶ 37          In November 2018, Detective Eddy completed the extraction of the photographs from the cellular telephone. Detective Eddy provided Detective Morrison with copies of the photographs he extracted from the cellular telephone. Subsequently, Detective Morrison asked I.G. to come to the police department to view the photographs. Before Detective Morrison showed I.G. the photographs, Detective Morrison asked I.G. to describe what she believed the photographs would show. Detective Morrison testified I.G. "said in some of the photo[graphs] that she would be wearing underwear. I asked her to describe the underwear to me. She said they were gray and that they were boy-short style underwear." Detective Morrison showed I.G. the photographs in People's Exhibit Group 7, and she indicated the photographs depicted her

buttocks with and without underwear on, and she stated the photographs showed the bathroom in her house.

¶ 38    The State offered People's Exhibit Group 7 into evidence.  Defense counsel objected and the trial court heard argument on the objection outside the presence of the jury. Defense counsel argued People's Exhibits 7C through 7I should not be admitted where the State failed to lay a proper foundation to admit the photographs and those photographs were irrelevant because I.G. testified she took the photographs.  As to People's Exhibits 7A and 7B, defense counsel argued the State failed to lay a proper foundation.  Defense counsel argued that while I.G. testified defendant took those photographs of her, her testimony about the angle at which the photographs were taken was inconsistent with where she said defendant stood.

¶ 39    The trial court found the State laid a proper foundation and admitted People's Exhibits 7A and 7B.  The court stated, "I'm also inclined to admit [People's Exhibits 7G, 7H, and 7I] because of the additional information on [G], [H], and [I]."  The court reserved ruling on People's Exhibits 7C, 7D, 7E, and 7F.

¶ 40    Before the State rested, outside the presence of the jury, the trial court again reviewed People's Exhibit Group 7.  The court stated,

> "My inclination is to let them all in because, one, they are
> relevant.  They tend to prove something that is in issue.  Both
> counsel have cross-examined the witness on them with regard to
> each one of the photo[graphs] including who took and who didn't
> take the photo[graphs].  If I would exclude some of the
> photo[graphs], my guess is we're going to get a jury question
> asking to see the photo[graphs] since both parties used the

photo[graphs].  In addition, definitely [People's Exhibits 7G, 7H, and 7I] are coming in because there's additions to the photo[graphs] which were taken off the [tele]phone *** they specifically have [I.G.'s] name, although misspelled."

The court admitted People's Exhibits 7G, 7H, and 7I into evidence.

¶ 41                                  6. *Detective Nick Eddy*

¶ 42        Nick Eddy, a detective with the Quincy Police Department, testified he performed the extraction of photographs from defendant's cellular telephone, and he described the process for the jury.  Detective Eddy described the cellular telephone he extracted images from as a "Samsung Galaxy S7 Edge with a blue case."  During the extraction, Detective Eddy retrieved all text messages, photographs, and browsing history from the telephone.

¶ 43        Detective Eddy gave Detective Morrison a copy of all the images he extracted from the telephone.  Detective Eddy also printed copies of the photographs that made up People's Exhibit Group 7.  Detective Eddy testified the photographs that made up People's Exhibits 7G, 7H, and 7I had captions and emojis on them when he extracted the photographs from the cellular telephone.  Detective Eddy was unable to tell when the photographs he extracted from the telephone were taken.

¶ 44                                  7. *Closing Argument*

¶ 45        During closing argument, the State argued, in relevant part,

          "And we can't ignore that—that two of the photo[graphs] had a label on them that had been placed on them, one of them was [I.G.'s] bubble booty and the other was bubble booty [I.G.] with the name [I.G.] spelled wrong.  *** [S]o certainly the defendant

put his mark on those photographs. And there is a third photo[graph] where he—there were two emojis like smiley faces on those. The extra titles added to those photographs and certainly the smiley faces add an extra insight, I guess you would say, into the defendant's thinking. It shows the sexual nature of his thinking. Certainly, there's no dispute that or there wouldn't be that if you take a photo[graph] of a bare butt[ocks] of a 15-year-old female what your intent is. That she is in a position—there's some sexual intent there. But I think the labels that he puts on those photo[graphs] is also some circumstantial evidence of what was going on with the defendant and is some circumstantial evidence to support that he not only photographed but he also sexually assaulted this young lady."

¶ 46                                     8. *Jury Instructions*

¶ 47        The trial court instructed the jury, in relevant part, "Neither opening statements nor closing arguments are evidence, and any statement or argument made by the attorneys which is not based on the evidence should be disregarded."

¶ 48                                     9. *Jury Verdict*

¶ 49        The jury found defendant guilty of two counts of criminal sexual assault and two counts of child pornography (photographing).

¶ 50                C. Defendant's Posttrial Motion and Sentencing Hearing

¶ 51        On February 4, 2019, defendant filed an amended posttrial motion alleging in part that (1) the trial court erred in allowing certain photographs to be admitted into evidence in

which "the victim testified that all but two of the photo[graphs] were taken by her and she further testified that she did not know when she took said [photographs] and could not remember when these [photographs] were taken" and (2) "[t]hat the remaining two photographs, the victim testified that the [d]efendant could not have taken them at the angle they were taken from where she testified he was standing when he allegedly took the photo[graphs]." On February 27, 2019, the trial court denied defendant's amended posttrial motion and held a sentencing hearing.

¶ 52     The court in sentencing defendant took into consideration the parties' arguments, the presentence investigation report (PSI), the addendum to the PSI, and the factors in aggravation and mitigation. The court stated,

"The [c]ourt believes that the State is correct in identifying the applicable factors both in mitigation and aggravation. The imprisonment would entail an excessive hardship to his dependents. However, I believe, according to the Presentence Investigation Report, there is only one group of dependents that he is currently supporting. [Defendant] reports he has split custody of two children, pays approximately $250 a month to support them. *** [B]ut that is a—somewhat of a factor in mitigation.

With regard to factors in aggravation, the defendant's conduct certainly caused serious harm. Caused serious harm to the victim. The [c]ourt also agrees with the reading of the State with regard to the defendant held a position of trust or supervision such as—and here are the keywords—but not limited to family member, teacher, scout leader, babysitter, or daycare worker so it is not

- 14 -

limited to those categories. [Defendant] spent a lot of time over at the house and I believe the testimony was that he was over there often and was a trusted family friend which allowed him access to the victim.

To do the minimum sentence would be contrary to deterring others from committing the same crime. He does have a history of prior delinquency or criminal activity. I will give him that he does not have a criminal conviction of this type. And the [c]ourt can take into account the age of the victim as to [the two counts of criminal sexual assault] because that is not an element of the offense."

Accordingly, the court imposed 13-year sentences for each count of criminal sexual assault and 6-year sentences for each count of child pornography (photographing), all to run consecutively, for an aggregate sentence of 38 years' imprisonment.

¶ 53          This appeal followed.

¶ 54                              II. ANALYSIS

¶ 55          On appeal, defendant argues (1) he received ineffective assistance of trial counsel for failing to object to the admission of photographs of I.G. that contained captions and emojis where the State failed to lay an adequate foundation to establish defendant created the photographs and (2) the trial court erred by imposing 13-year sentences for both counts of criminal sexual assault where mitigation factors supported a lesser sentence, and his aggregate sentence of 38 years' imprisonment was excessive. We review each issue in turn.

¶ 56                      A. Ineffective Assistance of Counsel

¶ 57        Defendant argues he received ineffective assistance of trial counsel. Specifically, he argues his trial counsel failed to object to the admission of photographs of I.G. that contained captions and emojis on grounds the State failed to lay an adequate foundation to establish defendant added the captions and emojis to the photographs.  As a result, defendant asserts he was prejudiced by the admission of the evidence.  Specifically, he was prejudiced where the State asserted in closing argument that the captions and emojis in the photographs demonstrated defendant's intent to commit both criminal sexual assault and child pornography.  The State argues it laid a proper foundation for the photographs at trial and thus counsel was not ineffective.  We agree with the State.

¶ 58        We review claims of ineffective assistance of counsel under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  To succeed on a claim of ineffective assistance of counsel, defendant must show (1) the attorney's performance fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defendant. *Id.* at 669.  Both prongs of the *Strickland* test must be satisfied; therefore, a finding of ineffective assistance of counsel is precluded if a defendant fails to satisfy one of the prongs.  *People v. Simpson*, 2015 IL 116512, ¶ 35, 25 N.E.3d 601.

¶ 59        Before we reach the question of ineffective assistance, we must determine whether the State laid an adequate foundation to establish defendant added the captions and emojis to the photographs in People's Exhibits 7G, 7H, and 7I.

¶ 60        "An adequate foundation is laid when a document is identified and authenticated." *People v. Chromik*, 408 Ill. App. 3d 1028, 1046, 946 N.E.2d 1039, 1055 (2011).  "To 'authenticate a document, evidence must be presented to demonstrate that the document is what its proponent claims.' " *Id.* (quoting *Gardner v. Navistar International Transportation Corp.*,

213 Ill. App. 3d 242, 247-48, 571 N.E.2d 1107, 1110 (1991). "A finding of authentication is merely a finding that there is sufficient evidence to justify presentation of the offered evidence to the trier of fact and does not preclude the opponent from contesting the genuineness of the writing after the basic authentication requirements are satisfied." *People v. Downin*, 357 Ill. App. 3d 193, 202-03, 828 N.E.2d 341, 350 (2005). "The prosecution need only prove a rational basis upon which the fact finder may conclude that the exhibit did in fact belong to the defendant." *Id.* at 203.

¶ 61         "A document may be authenticated by direct or circumstantial evidence." *Id.* "Circumstantial evidence of authenticity includes such factors as appearance, contents, and substance." *Id.* "*Prima facie* authorship of a document may include a showing that the writing contains knowledge of a matter sufficiently obscure so as to be known to only a small group of individuals." *Id.* We review a trial court's decision to admit a document under an abuse of discretion standard. *Id.* at 202.

¶ 62         We find the State laid an adequate foundation to establish defendant added the captions and emojis to the photographs in People's Exhibits 7G, 7H, and 7I. Here, I.G. testified defendant "took [photographs] of my butt[ocks] with underwear, and then there was [photographs] of my butt[ocks] without underwear." Specifically, I.G. stated defendant held out his cellular telephone to her and asked her to take photographs of her buttocks. I.G. testified defendant took photographs of her buttocks while she was wearing gray, "boy short boxer-type of underwear." Then defendant asked I.G. to pull her pants down to take photographs of her buttocks without underwear.

¶ 63         I.G. identified herself in People's Exhibit Group 7, which consisted of several photographs of I.G.'s buttocks with underwear and without underwear. I.G. identified People's

- 17 -

Exhibit 7G as the photograph of her buttocks with grey, boy short boxer-type underwear, and the photograph said, "[I.G.] bubble booty." I.G. testified she did not put the words on the photograph and that her name was spelled wrong. I.G. identified People's Exhibit 7H as the photograph of her buttocks with grey, boy short boxer-type underwear, and the photograph had "a couple of smiley faces on it." I.G. testified she did not put the smiley faces on the photograph. Specifically, I.G. stated, "I've never seen those, no." I.G. identified People's Exhibit 7I as the photograph of her buttocks with grey, boy short boxer-type underwear, and the photograph said, "bubble booty [I.G.]." I.G. again testified she did not know the words had been put on the photograph.

¶ 64        Detective Morrison testified when she arrested defendant, she obtained his cellular telephone. Defendant consented to police examining his cellular telephone. Specifically, defendant signed a consent form for police to search his "Samsung Galaxy Edge [cellular telephone] with a blue case." Detective Morrison then sent a laboratory request to examine the cellular telephone for "[p]hoto[graphs] of [I.G.], a 15-year-old black female, on the [tele]phone specifically of her butt[ocks] with and without clothes on and the [photographs] would probably be taken in a bathroom." Detective Morrison turned the cellular telephone over to the examiner, Detective Eddy.

¶ 65        Detective Eddy testified he performed the extraction of photographs from the cellular telephone, and he described the process for the jury. Detective Eddy described the cellular telephone he extracted images from as a "Samsung Galaxy S7 Edge with a blue case." Detective Eddy gave Detective Morrison a copy of all the images he extracted from the telephone. Detective Eddy testified the photographs that made up People's Exhibits 7G, 7H, and

7I had captions and emojis on them when he extracted the photographs from the cellular telephone.

¶ 66        After Detective Morrison received the extracted photographs from Detective Eddy, she asked I.G. to come to the police department to view the photographs. Detective Morrison showed I.G. the photographs in People's Exhibit Group 7, and she indicated the photographs depicted her buttocks with and without underwear on, and she stated the photographs showed the bathroom in her house.

¶ 67        Based on the evidence, we find the State provided a "rational basis" for the fact finder to conclude defendant added the captions and emojis to the photographs. Defendant provided his cellular telephone to police and consented to police searching his cellular telephone. The police then found photographs of I.G. with the captions and emojis on defendant's cellular telephone. Further, while I.G. testified defendant "took [photographs] of my butt[ocks] with underwear, and then there was [photographs] of my butt[ocks] without underwear[,]" I.G. did not recognize the captions or emojis on the photographs. Therefore, we find the circumstantial evidence indicates defendant added the captions and emojis to the photographs of I.G. found on his cellular telephone.

¶ 68        In support of his argument that the evidence failed to show the cellular telephone belonged to him or that he added the captions or emojis, defendant cites *People v. Watkins*, 2015 IL App (3d) 120882, 25 N.E.3d 1189, and *People v. Kent*, 2017 IL App (2d) 140917, 81 N.E.3d 578. We find the cases distinguishable.

¶ 69        In *Watkins*, 2015 IL App (3d) 120882, ¶¶ 11-12, upon executing a search warrant inside of a home where the defendant and five other people were present, police officers found drugs and multiple cellular telephones in an open kitchen drawer. One of the cellular telephones

contained drug-related text messages that were directed to someone named "Charles," which happened to be the defendant's first name. *Id.* ¶¶ 16-17. However, there was no evidence from the telephone itself that defendant was the owner. *Id.* ¶ 24. Under these circumstances, the appellate court determined the evidence was insufficient to authenticate the text messages as having been sent to the defendant. *Id.* ¶ 38.

¶ 70          In *Kent*, 2017 IL App (2d) 140917, ¶¶ 103, 119, the appellate court found the trial court abused its discretion in admitting a Facebook post because "the State offered neither direct nor circumstantial proof of authentication. [The] [d]efendant did not admit to creating a Facebook profile or making the post, and he was not seen composing the communication."

¶ 71          Here, circumstantial evidence showed the cellular telephone belonged to defendant. Defendant gave the cellular telephone to Detective Morrison. Further, defendant signed a form allowing police to search his cellular telephone, and he identified his cellular telephone in the form. Defendant identified the same cellular telephone from which Detective Eddy testified he extracted the photographs with the captions and emojis. Based on the evidence, we find the State laid an adequate foundation to establish defendant added the captions and emojis to the photographs.

¶ 72          Having determined the State presented sufficient evidence of authentication, we conclude defense counsel did not provide ineffective assistance by failing to object to the admission of the photographs with captions and emojis.

¶ 73          Even if the State failed to lay an adequate foundation to establish defendant added the captions and emojis to the photographs, defendant was not prejudiced because the photographs with the captions and emojis were not the only photographs to come in at trial. Rather, they were duplicates of other photographs that did come in except the photographs that

came in lacked the captions and emojis. The State properly admitted the other photographs of I.G., which showed her with underwear on and without underwear on. While we cannot find where in the record the trial court ever formally admitted People's Exhibits 7C-7F, the photographs of I.G. with underwear on, the State used the photographs during its case-in-chief, and defendant cross-examined I.G. and the detectives using the photographs.

¶ 74    Further, to the extent defendant argues he was prejudiced when the State used the captions and emojis in the photographs as evidence in closing argument to show defendant's intent to commit both criminal sexual assault and child pornography, we find the trial court properly instructed the jury that closing arguments are not evidence and any statement or argument made by an attorney which is not based on the evidence should be disregarded.

¶ 75    Moreover, even if the State had been prohibited from arguing the captions and emojis showed defendant's intent to commit both criminal sexual assault and child pornography, there is no reasonable probability the outcome would have been different. Here, the evidence was overwhelming. Most damning was the mere fact that defendant had inappropriate photographs of I.G. in her bathroom on his phone, to say nothing of I.G.'s verified description of defendant's penis and the corroboration of I.G.'s testimony that she and defendant were frequently alone in I.G.'s home. Accordingly, where defendant did not suffer any prejudice, his ineffective assistance claim fails.

¶ 76                    B. Excessive Sentence

¶ 77    Last, defendant argues the trial court erred by imposing 13-year sentences for each count of criminal sexual assault where mitigating factors supported a lesser sentence and his aggregate sentence of 38 years' imprisonment was excessive where it did not comport with the goal of restoring him to useful citizenship. In the alternative, defendant argues he received

ineffective assistance of counsel for failure to file a motion to reconsider defendant's sentence. The State argues defendant's sentence was not excessive where his sentence fell within the statutory guidelines and the trial court considered multiple factors in mitigation. We agree with the State.

¶ 78    The trial court has discretion in sentencing, and we will not reverse a sentence absent an abuse of discretion. *People v. Snyder*, 2011 IL 111382, ¶ 36, 959 N.E.2d 656. Such discretion in sentencing is necessary because "the trial court is in a better position to judge the credibility of the witness and the weight of the evidence at the sentencing hearing." *People v. Ramos*, 353 Ill. App. 3d 133, 137, 817 N.E.2d 1110, 1115 (2004). "A sentence which falls within the statutory range is not an abuse of discretion unless it is manifestly disproportionate to the nature of the offense." *People v. Franks*, 292 Ill. App. 3d 776, 779, 686 N.E.2d 361, 363 (1997).

¶ 79    "A sentence imposed by the trial court is presumed to be proper." *People v. Butler*, 2013 IL App (1st) 120923, ¶ 31, 994 N.E.2d 89. "There is a strong presumption that the trial court considered any evidence of mitigation presented to it." *Id.* "In order to rebut this presumption, the defendant must present some indication, other than the sentence imposed, that the trial court did not consider the mitigating evidence." *Id.*

¶ 80    Defendant forfeited his claim that his sentence is excessive where he failed to file a motion to reconsider the sentence. See 730 ILCS 5/5-4.5-50(d) (West 2016) ("A defendant's challenge to the correctness of a sentence or to any aspect of the sentencing hearing shall be made by a written motion filed with the [trial court] clerk within 30 days following the imposition of sentence."). When a defendant fails to file a motion to reconsider his sentence to preserve sentencing issues on appeal, the court's sentencing decision will only be overturned if

the defendant demonstrates plain error. *People v. Moreira*, 378 Ill. App. 3d 120, 131, 880 N.E.2d 263, 272 (2007).

¶ 81       Under the plain error doctrine, we first determine whether a clear or obvious error occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410-11 (2007). If the reviewing court determines a clear or obvious error occurred, the second step is to determine whether (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" or (2) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Id.* Thus, we turn to whether the court abused its discretion by committing a clear or obvious error in sentencing defendant to an aggregate sentence of 38 years' imprisonment.

¶ 82       The trial court errs when the sentence is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Stacey*, 193 Ill. 2d 203, 210, 737 N.E.2d 626, 629 (2000). As the court determines an appropriate sentence, "a defendant's history, character, and rehabilitative potential, along with the seriousness of the offense, the need to protect society, and the need for deterrence and punishment, must be equally weighed." *People v. Hernandez*, 319 Ill. App. 3d 520, 529, 745 N.E.2d 673, 681 (2001). "A defendant's potential for rehabilitation is not given greater weight than the seriousness of the crime." *People v. Haley*, 2011 IL App (1st) 093585, ¶ 64, 960 N.E.2d 670.

¶ 83       In determining defendant's sentence, the trial court considered the parties' arguments at sentencing, the PSI, the addendum to the PSI, and the factors in aggravation and mitigation. Defendant argued the factors in mitigation supported a minimum sentence where his

imprisonment would impose an excessive hardship on his dependents. Further, defendant held a steady job and only had one prior felony drug conviction. In sentencing defendant, the court addressed the hardship defendant's incarceration imposed on his dependents. However, the court found the serious harm defendant caused to the victim greatly outweighed any mitigating factors. The court also expressed a strong need for deterrence. Specifically, the court stated,

> "The [c]ourt believes that the State is correct in identifying the applicable factors both in mitigation and aggravation. The imprisonment would entail an excessive hardship to his dependents. However, I believe, according to the Presentence Investigation Report, there is only one group of dependents that he is currently supporting. [Defendant] reports he has split custody of two children, pays approximately $250 a month to support them. *** [B]ut that is a—somewhat of a factor in mitigation.
>
> With regard to factors in aggravation, the defendant's conduct certainly caused serious harm. Caused serious harm to the victim. The [c]ourt also agrees with the reading of the State with regard to the defendant held a position of trust or supervision such as—and here are the keywords—but not limited to family member, teacher, scout leader, babysitter, or daycare worker so it is not limited to those categories. [Defendant] spent a lot of time over at the house and I believe the testimony was that he was over there often and was a trusted family friend which allowed him access to the victim.

To do the minimum sentence would be contrary to deterring other from committing the same crime. He does have a history of prior delinquency or criminal activity. I will give him that he does not have a criminal conviction of this type. And the [c]ourt can take into account the age of the victim as to [the two counts of criminal sexual assault] because that is not an element of the offense."

¶ 84 We find the trial court did not abuse its discretion when it imposed 13-year sentences for each count of criminal sexual assault and 6-year sentences for each count of child pornography (photographing), all to run consecutively, for an aggregate sentence of 38 years' imprisonment. Defendant's sentence fell within the statutory range and was not disproportionate to the nature of the offense. The trial court at sentencing took into consideration the factors in mitigation but found the factors in aggravation and the need for deterrence outweighed the minimal factors in mitigation. Therefore, we cannot say the court abused its discretion by sentencing defendant to an aggregate sentence of 38 years' imprisonment in this case. Accordingly, defendant fails to demonstrate a clear or obvious error to support his contention of plain error.

¶ 85 Given our analysis regarding the propriety of the sentence imposed, we see no basis to criticize counsel's failure to file a motion to reconsider defendant's sentence. Thus, we conclude defendant's ineffective assistance claim fails where he cannot demonstrate deficient performance or prejudice under the *Strickland* analysis.

¶ 86                                    III. CONCLUSION

¶ 87 For the reasons stated, we affirm the trial court's judgment.

¶ 88        Affirmed.